**BRUNSWICK CORPORATION,**
Appellant,

v.

**The UNITED STATES, Appellee.**

No. 91–1201.

United States Court of Appeals,
Federal Circuit.

Dec. 11, 1991.

John B. Denniston, of Covington & Burling, Washington, D.C., argued (F. James Tennies, of counsel), for appellant.

Paul A. D'Aloisio, of the Civ. Div., Dept. of Justice, Washington, D.C., argued (Stuart M. Gerson, Asst. Atty. Gen., David

M. Cohen, Director, and Martha H. De-Graff, Asst. Director, on brief), for appellee.

Before ARCHER, LOURIE and RADER, Circuit Judges.

LOURIE, Circuit Judge.

Brunswick Corporation appeals the decision of the Armed Services Board of Contract Appeals (Board) granting summary judgment in favor of the United States. Brunswick had sought an adjustment to its contract to supply camouflage systems to the United States Army Troop Support Command (TROSCOM). The Board held that TROSCOM's interpretation of the contract's "Adjustment for Unanticipated Economic Fluctuation" clause (EPA clause) was correct, that Brunswick's was incorrect, and that the contract was unambiguous. *See Brunswick Corp.*, ASBCA Nos. 32973, 33726 and 34151, 91–1 B.C.A. (CCH) ¶ 23,458 at 117,679 (Oct. 19, 1990). We affirm.

## BACKGROUND

Brunswick entered into a $64 million contract with TROSCOM which required Brunswick to deliver camouflage systems during a three-year period. The original Request for Proposal (RFP) and the final contract contained an EPA clause which provided that the contract price would be adjusted after performance to account for economic fluctuations (inflation or deflation). The pertinent parts of the EPA clause are provided in the attached Appendix.

The EPA clause assumed, and it is not disputed, that offerors included in their bid price an amount for *anticipated* economic fluctuations during the contract years. According to the clause, the contract price was to be adjusted further after performance to represent *unanticipated* economic fluctuations. The amount of the adjustment to the contract price would depend upon the difference between the actual eco-nomic fluctuations which occurred during performance and anticipated economic fluctuations included in the contract price. A 2% threshold was provided; no adjustments were to be made if the fluctuation did not exceed 2%.[1] According to the EPA clause, "*ANTICIPATED* COMPOSITE ESCALATION FACTORS," set forth in Table I, would be used to "determine the base against which *unanticipated* economic fluctuations may be made." (Emphasis added).

The factors in Table I represented the government's estimated multiplier for labor and material costs in a given year, *e.g.*, labor and material that cost $1.00 at the time of Brunswick's offer would cost $1.0293 at the end of the first year of the contract. The Table I factors were derived entirely from the forecasted indices in Table II of the EPA clause. The forecasted indices used in Table II were from the United States Department of Labor, Bureau of Labor and Statistics (BLS).

Prior to the award, Brunswick had an opportunity to request changes in the contract provisions; it in fact claimed that the BLS indices in Table II were not representative of its costs, and recommended that a cap on any upward adjustment provided in the original RFP be eliminated. The government agreed to these changes.

When Brunswick prepared its bid, it did not use the procedures in the EPA clause for calculating *anticipated* economic fluctuation; it used its own predictions to arrive at the $64 million contract price. The original date for submission of responses to the RFP was January 31, 1983. This date was extended by subsequent amendments, to June 7, 1983. TROSCOM awarded the contract to Brunswick on September 28, 1983, about five months after the assumed April 1983 date in the EPA clause.

At the end of each performance year, Brunswick submitted a request for adjustment under the EPA clause. Instead of using the BLS indices in Table II, it replaced the Table II values with BLS indices

---

**1.** The EPA clause also provided that 70% of the contract price was subject to adjustment to account for the amount of *unanticipated* inflation in the contract price. The remaining 30% of the contract price was not subject to adjustment.

which reflected the delay in the award. It used these new indices to calculate new Table I factors, and requested contract price adjustments based upon its own Table I factors. The result of that calculation showed that Brunswick was entitled to an upward adjustment of $952,090.

The government denied the requests for adjustment, asserting that the contract's Table I factors were to be used to calculate any contract price adjustment, and that Brunswick was only entitled to an upward adjustment of $338,279. Brunswick appealed to the Board, and the Board agreed with the government, holding that the EPA clause provided that the unchanged Table I factors should be used to determine the anticipated inflation. Brunswick now appeals to this court.

## DISCUSSION

■ The question before us in determining whether the Board correctly interpreted the EPA clause is whether the factors used to calculate anticipated economic fluctuations, which were set forth in the contract, can be varied as a result of a delay in the award of the contract. We note at the outset that the Board's interpretation of a contract is a legal conclusion, which is therefore freely reviewable. *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 579 (Fed.Cir.1987). However, the Board's interpretation is given careful consideration, as the Board has considerable experience and expertise in interpreting government contracts. *Alvin Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1564 (Fed.Cir.1987). In determining how a reasonable person intended the terms of the contract, we give the language its ordinary and commonly accepted meaning unless it is shown that the parties intended otherwise. *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 351 F.2d 972, 976 (1965).

■ Subparagraph (a) of the EPA clause provides that part of the contract price "is subject to adjustment for unanticipated ec-onomic fluctuation. That portion of the price (70%) will be deemed by the Government to include an amount for anticipated economic fluctuation *based on the factors set forth in Table I.*" (Emphasis added). Paragraph (e) of the clause similarly requires that "[t]he Government *shall use the forecasted composite escalation factors set forth in Table I* to determine the base against which unanticipated economic fluctuation adjustments may be made." (Emphasis added). Thus, the contract language is unambiguous in requiring that each offer contain an amount for anticipated economic fluctuations, and that the amount be based on the Table I factors provided.[2]

Brunswick argues, however, that the government's interpretation of subparagraphs (a), (c), and (e) is inconsistent with subparagraph (q) of the EPA clause. Subparagraph (q) provides an "example of the methodology which shall be employed in arriving at an adjustment for unanticipated economic fluctuation...." Under the heading "SAMPLE CALCULATIONS (FOR INFORMATIONAL PURPOSES ONLY)," subparagraph (q) provides a 5–step explanation as to how one determines unanticipated economic fluctuation, the amount by which the contract would be further adjusted for inflation. The five steps include (1) *"Forecasted* composite escalation factor[s]"; (2) calculation of the "Base Price," the original contract price without the anticipated inflation; (3) calculation of the actual escalation; (4) application of the 2% threshold test; and (5) calculation of the final adjustment for unanticipated inflation.

At the heart of the matter is step (1) of subparagraph (q). Brunswick argues that subparagraph (q), in stating a methodology "which shall be employed," requires recalculating new Table I factors under step (1) to reflect the delay in award. We disagree. On its face, step (1) provides an explanation of how the Table I factors were determined. The use of the past-tense *"Fore-*

---

**2.** Further support for the government's position that the factors set forth in Table I were not to be varied is provided in subparagraph (c) of the EPA clause, which states that an adjustment to the contract price "shall be made" based upon the "values set forth in Table II."

casted," when referring to the calculation of the Table I values, indicates that step (1) does not involve a future calculation, since the contract's Table I factors have already been calculated; the sample calculations are explicitly "FOR INFORMATIONAL PURPOSES ONLY." (Emphasis in original.) Nothing in subparagraph (q) provides for recalculation of "new" Table I factors to reflect the actual award date rather than the one indicated in Table I. Step (1) clearly refers to a *Forecasted* composite escalation factor"; the use of this factor is mandated by subparagraph (e) to "determine the base against which unanticipated economic fluctuation adjustments may be made."

Although we agree that subparagraph (q) is not a model of clarity, to interpret it to change the Table I factors of anticipated economic fluctuation after a contract award has been made would provide Brunswick with an advantage not available to other competitors during the solicitation and award process. Subparagraph (q), in its definitions section or in its "example" section, does not provide that either Brunswick or the government can use factors other than those contained in Table I of the EPA clause when making the calculations explained in the example contained in subparagraph (q). The Board properly construed subparagraph (q) to calculate actual unanticipated fluctuation, but not anticipated fluctuation. This interpretation provides internal consistency within subparagraph (q) as well as consistency with subparagraphs (a), (c), and (e).

■ Brunswick also argues that the Board misconstrued subparagraph (h)(4), arguing that in order to calculate a "final adjustment" under (h)(4), one must perform the calculations described in the five steps of subparagraph (q), the first of which is calculating the *forecasted* escalation factors. Subparagraph (h)(4) provides that "[i]n the event that any of the milestones listed in paragraph (h)(1) above occur before or after the assumed dates, the program years in Table I shall reflect actual award and deliveries *for final adjustment purposes*." (Emphasis added). As we

have held, subparagraph (q) is limited to the calculation of actual unanticipated economic fluctuation; it does not apply to both actual *and* anticipated fluctuation. Thus, the most reasonable interpretation of subparagraph (h)(4) is that "for final adjustment purposes" refers to the adjustment made for unanticipated fluctuation after the contract has "finally" been performed, using the actual program years, rather than to recalculate the "up front" assumption made in the bidding process. This interpretation is consistent with subparagraphs (a), (c), and (e).

Brunswick seeks reversal based on what it calls an intuitive argument, that the factors used to arrive at anticipated and actual fluctuation should be the same. However, Brunswick's interpretation is not supported by the contract language and can be harmonized only by ignoring important contract language. For these reasons, we hold that the Board's interpretation of the EPA clause was correct.

■ Brunswick also argues that various provisions in the contract make the contract ambiguous, that the ambiguity is latent, and that Brunswick's interpretation should be adopted as the reasonable interpretation. Under Brunswick's interpretation, however, the inconsistencies in the contract would be glaring, and would have imposed an *obligation* on Brunswick to inquire of the government as to the correct interpretation of the RFP. *See Fort Vancouver Plywood Co. v. United States,* 860 F.2d 409, 414 (Fed.Cir.1988). It did not question this provision. Moreover, the mere fact that the parties differ on the proper interpretation of the EPA clause does not mean that it is ambiguous. *See Tri-Cor, Inc. v. United States,* 198 Ct.Cl. 187, 458 F.2d 112, 126 (1972). Because we hold that the EPA clause is unambiguous, and that the Board's interpretation was correct, we need not address application of the doctrine of *contra` proferentum.*

Finally, the government should not be required, as argued by appellant, to alter its method of calculating actual economic fluctuation. There is no limitation on the government concerning how it determines

anticipated and actual fluctuation, as long as the method is set forth in a contract agreed to by the parties, as occurred here.

We have considered Brunswick's other arguments and find them unpersuasive.

## CONCLUSION

The decision of the Armed Services Board of Contract Appeals is

AFFIRMED.