**STUDIENGESELLSCHAFT KOHLE, M.B.H., Plaintiff–Appellant,**

v.

**HERCULES, INC., Himont U.S.A., Inc. and Himont, Inc., Defendants– Appellees.**

**No. 95–1465.**

United States Court of Appeals, Federal Circuit.

Jan. 24, 1997.

Rehearing Denied Feb. 21, 1997.

Nathaniel D. Kramer, Sprung Horn Kramer & Woods, Tarrytown, NY, argued, for plaintiff-appellant. With him on the brief was Arnold Sprung.

James Galbraith, Kenyon & Kenyon, New York City, argued, for defendants-appellees. With him on the brief were Kenneth E. Madsen and Richard M. Rosati.

Before MAYER, Circuit Judge, COWEN, Senior Circuit Judge, and RADER, Circuit Judge.

MAYER, Circuit Judge.

In 1986, Studiengesellschaft Kohle m.b.H. (SGK) sued Hercules, Inc.; Himont U.S.A., Inc.; and Himont, Inc. (collectively "Hercules") for patent infringement. Hercules counterclaimed, alleging that SGK had breached the most favored licensee provision of their license agreement by failing to offer Hercules a license with the same terms it offered other licensees. But for the breach, Hercules argued, it would have been licensed under the patents at issue during the period in question, thereby insulating it from infringement. The district court agreed and entered judgment for Hercules. *Studiengesellschaft Kohle m.b.H. v. Hercules, Inc.*, No. 86–566–JJF (D.Del. June 30, 1995). Because

SGK has not established that the court made any clearly erroneous findings of fact or error of law, we affirm. We remand for the court to determine whether SGK is entitled to interest on its license fee.

## Background

SGK is the licensing arm of the Max-Planck Institute for Coal Research in Germany and the successor-in-interest to Professor Karl Ziegler, the Institute's former head, who died in 1973. For simplicity, we refer to both Professor Ziegler and SGK as SGK. Hercules manufactured and sold plastics from the 1950s through 1983, when it sold its polypropylene business to Himont U.S.A., Inc.

In the early 1950s, SGK invented a catalyst that could be used to make plastics, such as polyethylene and polypropylene. In 1954, SGK and Hercules entered a "polyolefin contract" (the "1954 contract") granting Hercules a nonexclusive license under SGK's "Patent Applications and Patents Issued Thereon." Although the United States had not issued SGK any patents at that time, the contract contemplated that Hercules would be licensed under any SGK patent issued in the future in the plastics field. The contract included a most favored licensee provision, set forth in pertinent part:

If a license shall hereafter be granted by [SGK] to any other licensee in the United States or Canada to practice the Process or to use and sell the products of the Process under [SGK's] inventions, Patent Applications or Patents or any of them, then [SGK] shall notify Hercules promptly of the terms of such other license and if so requested by Hercules, shall make available to Hercules a copy of such other license and Hercules shall be entitled, upon demand if made three (3) months after receiving the aforementioned notice, to the benefit of any lower royalty rate or rates for its operations hereunder in the country or countries (U.S. and Canada) in which such rates are effective, as of and after the date such more favorable rate or rates became effective under such other license but only for so long as and to the same extent and subject to the same condi-

tions that such … lower royalty rate or rates shall be available to such other licensee; provided, however, that Hercules shall not be entitled to such more favorable rate or rates without accepting any less favorable terms that may have accompanied such more favorable rate or rates.

The contract also contained a termination clause, which granted SGK the right to terminate the agreement and the licenses upon sixty days written notice if Hercules failed to make royalty payments when due. However, Hercules had the right to cure its default by paying SGK "all sums then due under [the] Agreement," in which case the licenses would remain in full force and effect. The contract would be construed under Delaware law.

The parties amended the contract in 1962 and 1964, revising, *inter alia*, the royalty rates Hercules was to pay SGK. Both amendments contained savings provisions, stating that the 1954 contract remained effective except to the extent modified by those two amendments. SGK does not allege that these amendments modified the most favored licensee provision.

In 1972, the parties again amended the 1954 contract by granting Hercules "a fully paid-up" license through December 3, 1980, the date the '115 patent expired, under SGK's "U.S. Patent rights with respect to polypropylene … up to a limit of six hundred million pounds (600,000,000) per year sales." For sales exceeding that amount, Hercules was obligated to pay SGK royalties of one percent of its "Net Sales Price." As to SGK's patents expiring after December 3, 1980, Hercules possessed the right, upon request, to obtain "a license on terms no worse than the most favored other paying licensee of [SGK]." SGK concedes that this provision granted Hercules the "right to the most favored paying licensee's terms regardless of whether those terms had been granted before or after 1972." The amendment also provided that the terms and conditions of the 1954 contract remained in full force and effect except as modified by, or inconsistent with, this amendment. SGK concedes that "the notice provision, indeed the whole [most-favored licensee] clause, 'survived the 1972 Agreement.'"

On November 14, 1978, SGK was issued U.S. Patent No. 4,125,698 ('698 patent) for the "Polymerization of Ethylenically Unsaturated Hydrocarbons." The parties agree that under the 1972 amendment Hercules was licensed under the '698 patent, without any additional payment, through December 3, 1980. It is also undisputed that this patent is covered by the 1954 agreement, as amended.

In March 1979, SGK sent Hercules a letter terminating the 1954 contract and the licenses granted under it "for failure to account and make royalty payments" when due. In accordance with the agreement, the letter stated that the termination would become effective in sixty days unless the "breach" had been corrected and the payments made. Hercules paid SGK $339,032 within the sixty-day period, which SGK accepted. Although SGK possessed the right to question any royalty statement made by Hercules, and to have a certified public accountant audit Hercules' books to verify or determine royalties paid or payable, it did not do so.

On May 1, 1980, more than seven months before the expiration of Hercules' "paid-up" license, SGK granted Amoco Chemicals Corporation (Amoco) a nonexclusive "paid-up" license to make, use, and sell products covered by SGK's polypropylene patents in the United States. In exchange, Amoco paid SGK $1.2 million. SGK does not dispute that the '698 patent is covered by this license or that it failed to apprise Hercules of the license at the time it was granted. Hercules first learned of Amoco's license in 1987, after SGK commenced this action. It demanded an equivalent license retroactive to December 3, 1980. SGK refused, contending that (1) Amoco was not a "paying licensee," as contemplated by the 1972 amendment; (2) Hercules' request was too late; and (3) Amoco's license was granted as part of a settlement agreement.

Prior to that time, in 1983, SGK saw a publication of industry-wide production figures, suggesting that Hercules had produced 890 million pounds of polypropylene in 1980. It asked Hercules why it had not made any royalty payment for the amount exceeding the 600 million pound royalty-free limit.

Hercules claimed that while it had used or sold 747 million pounds of polypropylene, less than 600 million pounds met the definition of polypropylene requiring royalty payment. SGK argued that the excess use or sales required the payment of royalties under either the original 1954 contract or the 1972 amendment. Hercules responded that it believed it had fulfilled all of its royalty obligations.

On December 3, 1986, SGK filed suit in the United States District Court for the District of Delaware, charging Hercules with infringement of the '698 patent. Hercules counterclaimed, alleging that the 1954 license, as amended, required SGK to notify it of the Amoco agreement in 1980, the terms of which it was entitled to obtain via the most favored licensee provision of the 1954 contract, as amended. Hercules argued that it would have exercised its right to obtain a license on Amoco's terms had SGK not breached that provision. It claimed, therefore, that it was entitled to such license, retroactive to December 3, 1980, upon paying SGK $1.2 million. The court agreed and entered judgment for Hercules. This appeal followed.

### Discussion

▄▄▄ We review the district court's factual determinations for clear error. Its legal conclusions, on the other hand, must stand unless they are incorrect as a matter of law. Fed.R.Civ.P. 52(a); *King Instruments Corp. v. Perego*, 65 F.3d 941, 945, 36 USPQ2d 1129, 1131 (Fed.Cir.1995). Central to this case is the proper construction of the parties' license agreement. This is a question of contract interpretation under Delaware law, which we review *de novo. See Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381, 1384, 37 USPQ2d 1884, 1887 (Fed.Cir.1996).

▄▄▄ SGK first argues that the court erred in holding that it was contractually required to give Hercules notice of the terms of the Amoco license. Under Delaware law, we must "give effect to the intent of the parties as evidenced by the terms of the contract." *Burge v. Fidelity Bond and Mortgage Co.*, 648 A.2d 414, 420 (Del.1994). We look first

to the plain language. *See Ed Fine Oldsmobile, Inc. v. Diamond State Tel. Co.*, 494 A.2d 636, 638 (Del.1985). In May 1980, SGK granted Amoco a "paid-up" license to make, use, or sell products covered by the '698 patent in exchange for $1.2 million. At that time, Hercules was also licensed under the '698 patent, but only until December 3, 1980, approximately fifteen years prior to its scheduled expiration. The most favored licensee provision of the 1954 contract, which SGK agrees survived the agreement's three subsequent amendments, provides that if SGK grants any other license in the United States or Canada to practice the process or to use or sell products under SGK's patents, including the '698 patent, then SGK "shall notify Hercules promptly of the terms of such other license."

SGK concedes that the notice provision was effective but argues that it was only obligated to provide Hercules with notice of any license with terms more favorable than Hercules' license. In 1972, Hercules obtained a "paid-up" license under SGK's patents through December 3, 1980. In 1978, the '698 patent issued. Hercules was licensed under that patent, without additional cost, by virtue of the 1972 license. Because Hercules obtained a "free" license under the '698 patent for the first 600 million pounds, no terms could be more favorable, according to SGK. So, it had no duty to apprise Hercules of the Amoco license.

SGK's interpretation does violence to the plain language of the 1954 contract. The notice clause did not condition SGK's obligation to inform Hercules of other licenses on whether such licenses were more favorable. It required SGK to notify Hercules promptly of the terms of a license granted "to any other licensee." Under SGK's construction, the power to determine whether another license was more favorable resided not with Hercules, but with SGK. That simply was not what the agreement provided. It is true that the 1954 contract granted Hercules the right, upon demand, to the benefit of any "more favorable rate or rates." However, that clause signified nothing more than the commercial reality that Hercules would opt only for a license whose terms it

thought were more favorable than its own. It did not divest Hercules of the right to decide which terms were more favorable. Indeed, such a decision will not always be apparent when one considers the myriad combinations of royalty payments, lump-sum payments, and technology transfers a license can effect. Consequently, the court was correct that SGK's failure to provide notice constituted a breach of the license agreement.

■ SGK next says that it had no obligation to grant Hercules a license with terms equivalent to those in the Amoco license because Amoco was not a "paying licensee" within the meaning of the 1972 amendment. Again, we turn to the plain language of the license and interpret it anew. The 1972 amendment provided that for any of SGK's patents expiring after December 3, 1980, including the '698 patent, SGK would "grant Hercules, upon request, a license on terms no worse than the most favored other paying licensee of [SGK]." SGK contends that Amoco was not a "paying licensee" because it made just one lump-sum payment and no royalty payments; only licensees that make ongoing royalty payments are "paying licensee[s]."

In construing the term "paying licensee," we must give the words their ordinary meaning unless a contrary intent appears. *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 824 (Del.1992). The ordinary meaning of the term "paying licensee" is one who gives money for a license. *See* Webster's II New Riverside University Dictionary 863 (1984) (defining "pay" as "[t]o give money to in return for goods or services rendered"). SGK has not established that the parties intended that the term should mean something else. We see no distinction between one who makes an up-front, lump-sum payment and one who makes continuing royalty payments. Indeed, such a distinction would be doubly doubtful because a "paid-up" license presumably includes potential future royalty payments discounted to their net present value.

SGK also argues that the $1.2 million payment was in settlement of litigation; Amoco was not intended to be a "paying licensee." But the court found that Amoco paid SGK

$1.2 million for a paid-up license for unlimited production under, *inter alia,* the '698 patent. SGK has not shown how this finding is clearly erroneous: Amoco was a "paying licensee."*

■ Even were we to accept SGK's interpretation as reasonable, however, the provision would be ambiguous because Hercules' construction is also reasonable. *See Kaiser Aluminum Corp. v. Matheson,* 681 A.2d 392, 395 (Del.1996) (contract provision is ambiguous if it is reasonably susceptible of two or more interpretations). Under such circumstances, and in the absence of any extrinsic evidence clearly establishing the parties' intent, we construe the term "paying licensee" against the drafter of the language—SGK— under the doctrine of *contra proferentem. Id.* at 398 ("It is a well-accepted principle that ambiguities in a contract should be construed against the drafter."). So, Hercules' interpretation would still prevail.

■ According to SGK, even if Hercules is entitled to terms equivalent to those in the Amoco license, it exercised its option too late to be effective. This argument fails because the only requirement in the 1954 contract or its amendments that limits the time in which Hercules must request a license is that it be within three months of receiving the required notice. Because SGK failed to notify Hercules of the Amoco license, that time limitation never began. The court found that Hercules first became aware of the Amoco license in 1987 through discovery in this case. Hercules demanded an equivalent license on or about March 16, 1987, so even if constructive notice could trigger the three-month limitation, Hercules met it.**

.■ SGK also contends that the court erred in concluding that Hercules was entitled to a license retroactive to December 3, 1980. It argues that for six years Hercules intentionally manufactured products covered by the '698 patent, which it thought was invalid, without a license. Only after this

court ruled that the patent had not been proven invalid, *see Studiengesellschaft Kohle mbH v. Northern Petrochemical Co.,* 784 F.2d 351, 228 USPQ 837 (Fed.Cir.1986), did Hercules become interested in obtaining a license. It requested a license retroactive to the date its allegedly infringing activities began, thereby insulating itself from any infringement claim. SGK argues that "nothing in Hercules' option provides for such a right."

To be sure, neither we nor the parties can know with certainty whether Hercules would have exercised its right to a license on Amoco's terms in 1980, had it received the required notice. To that extent the prospect of absolving six years of alleged infringement via a retroactive license is troubling. But the uncertainty was caused by SGK's breach, the consequences of which it must bear. The 1954 contract expressly and unambiguously provides Hercules with the right to obtain the terms of another license "effective, as of and after the date such more favorable rate or rates became effective under such other license." The agreement must stand as written. Hercules is entitled to the terms of the Amoco license effective May 1980, when the Amoco license became effective.

Finally, the parties disagree on whether Hercules must pay interest on the $1.2 million license fee. Because the court has not addressed this issue, we remand.

### Conclusion

Accordingly, the judgment of the United States District Court for the District of Delaware is affirmed, and the case is remanded.

*AFFIRMED AND REMANDED.*

---

\* Our conclusion that the court did not err in finding that Amoco paid $1.2 million for its license also disposes of SGK's contention that Hercules should pay more than that amount.

\*\* We also see no error in the court's rejection of SGK's other arguments that it had no duty to

grant Hercules the terms of the Amoco license because Hercules breached the license agreement by failing to make all required royalty payments, and SGK had effectively terminated the agreement.