**BRISTOL–MYERS SQUIBB CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–923C.**

United States Court of Federal Claims.

Dec. 18, 2000.

Robert P. Reznick, Washington, DC, for plaintiff. Robert P. Kennedy, Hughes Hubbard & Reed LLP, Washington, DC, and Ivonne Cabrera, Charles Linzner, Douglas S. Worthington, and Matthew P. Blischak, Bristol–Myers Squibb Co., New York City, of counsel.

Sheryl L. Floyd, Washington, DC, with whom was Assistant Attorney General David W. Ogden, for defendant. Richard Lambert and Annette Levey, National Institutes of Health, Bethesda, MD, of counsel.

## *OPINION*

MILLER, Judge.

This case is before the court after argument on cross-motions for summary judgment. Twelve years after a license for compounds used in anti-HIV drugs issued, the Government demanded royalty payments for the sales of products made in the United States during the period before a patent issued in the country of sale. The licensee challenges whether the terms of the licensing agreement mandate these payments. Although each party embraces the contract's plain meaning as decisive, the court determines that the matter cannot be resolved based on the plain language of the agreement.[1]

---

1. The complaint also put in issue whether the Government improperly demanded audit costs reimbursement from the licensee in the amount of $28,046.00. In its reply brief, defendant conceded that it owed plaintiff the claimed amount. Def.'s Br. filed Sept. 21, 2000, at 15.

Although plaintiff also pleaded its case under the Contract Disputes Act of 1978, 41 U.S.C.

## FACTS

This action is a royalty dispute centering around license number L–020–88/0 (the "Agreement") between Bristol–Myers Squibb ("plaintiff") and the National Technical Information Service (the "NTIS"), a part of the Department of Commerce. NTIS was responsible for licensing certain intellectual property owned by the National Institutes of Health ("NIH") during the Agreement negotiations, until 1994, when the NIH began licensing and managing its intellectual property through the Office of Technology Transfer ("OTT"). Effective since February 1, 1988, the Agreement gave plaintiff an exclusive licence to "make, have made, use and sell" the compounds 2′,3′-dideoxyadenosine ("ddA")/2′,3′-dideoxyinosine ("ddI"), becoming a nonexclusive license ten years from the date of the first commercial sale of the Licensed Product. The compounds showed promise for anti-HIV drugs and the Agreement required plaintiff to continue developing the compounds into medicine in the marketplace, including obtaining regulatory approval in the United States and abroad.

Both parties take the position that the contract language is clear, but with differing readings. Plaintiff contends that royalties are not owed on product sold until a patent has issued in the country of manufacture or sale, premising its argument on the language and structure of the royalty provision, section 4.4. Defendant, on the other hand, asserts that both patent applications and issued patents trigger royalties, based on terms defined within the contract. Section 4.4 of the Agreement sets forth the circumstances when a royalty payment is due:

> In consideration of the rights and licenses granted by NTIS to LICENSEE and its

AFFILIATES hereunder, LICENSEE shall pay or cause to be paid to NTIS a royalty of five percent (5%) during the exclusive period of this Agreement and three percent (3%) during the non-exclusive period of this Agreement, on the Net Sales of Licensed Product sold by LICENSEE and its included AFFILIATES and sublicensees provided, however, that the Licensed Product sold is covered by a valid claim of a Licensed Patent(s), or made or used by a process covered by a valid claim of Licensed Patent(s), or is sold under circumstances which, if unlicensed, would otherwise constitute infringement of a valid claim in a Licensed Patent(s). Only one royalty shall attach on Net Sales provided the Licensed Product is made or sold in the Licensed Territory. The obligation to pay royalties to NTIS under this Article IV is imposed only once with respect to the same unit of Licensed Product regardless of the number of valid claims of Licensed Patent(s) covering the same. In the event that such royalty rate shall cause LICENSEE or any AFFILIATE difficulty in making the Licensed Product available in any country, LICENSEE can give NTIS written notice of this fact and NTIS agrees to then enter into good faith negotiation of such rates.

The terms "Net Sales," "Licensed Patent(s)," and "Licensed Product," are key terms of the royalty provision which the contract defines. Section 1.4 of the Agreement defines "Net Sales" as sales only to "independent third parties" and adjusts to account for standard commercial expenses.[2] The Agreement defines both "Licensed Patent(s)" and "Licensed Product" as including pending patent

---

§§ 601–613 (1994 & Supp. IV 1998) (the "CDA"), plaintiff abandoned its alternative grounds for jurisdiction under the CDA in its reply brief. Pl.'s Br. filed Aug. 10, 2000, at 16 n. 11.

**2.** This section reads:
1.4 Net Sales shall mean the amount billed or invoiced on sales of any Licensed Product to independent third parties or, in the event of disposal of any Licensed Product other than as scrap prior to its shipment from its place of manufacture or predisposal storage or other

than by sales, the amount billed or invoiced for a like quantity and quality of Licensed Product on or about the time of such disposal, less:
 (a) Customary trade, quantity or cash discounts and nonaffiliated brokers' or agents' commissions actually allowed and taken;
 (b) Amount repaid or credited by reason of rejections or returns; and
 (c) Freight charges or other transportation costs, insurance charges duties, tariffs and all sales ... or turnover or delivery of material produced under this Agreement.

applications and issued patents pertaining to the antiviral compounds.[3]

In 1989 the United States obtained a method of use patent for ddI in the United States and certain foreign countries, which covers ddI as an antiviral agent effective against HIV.[4] A patent application covering the compositions of ddA/ddI was pending at the time the Agreement was executed.[5] On October 9, 1991, plaintiff received approval from the Food and Drug Administration (the "FDA") for ddI, which it then began manufacturing and selling as Videx(R) both in the United States and in other markets. The composition patent was still pending in the United States at that time and is a key factor in this dispute as it covers the manufacturing of ddI. Section 8.5 of the Agreement required plaintiff to manufacture ddI substantially in the United States or its territories and possessions, including Puerto Rico. Thus, if defendant's interpretation of the royalties clause is correct, then royalties would be due from the date of the first sale of Videx(R) anywhere, as long as plaintiff produced Videx(R) in the United States (a Licensed Territory with a pending process patent). However, if plaintiff's reading of the royalties clause is correct, royalties would only be due for the sale of ddI in a country with an issued use patent and not for sales in a non-use patent country,

even if the ddI were manufactured or sold where a patent was still pending.

Plaintiff was required to submit royalty statements to NTIS, and later to OTT, as well as make royalty payments on a semi-annual basis. Each royalty statement categorized sales by the country subject to the royalty and calculated the royalty due for each.[6] In plaintiff's statement for the first half of 1992, which was sent by a letter dated August 31, 1992, plaintiff took a credit for what it considered a previous overpayment of royalties. In explanation of the credit, the letter noted that "[t]he negative sales and royalty amounts above reflect credit to [plaintiff] for 2nd Half 1991 sales and payments for non-patent countries." According to plaintiff, the note was an express statement of plaintiff's belief that royalties were due only for countries where there was an applicable issued patent.[7]

Thereafter, plaintiff contends it continued to pay royalties based on its view that royalties were not due in non-patent countries. However, according to defendant, plaintiff sporadically paid royalties on sales in countries where patents were still pending at the time of the payments.[8] OTT did not object to plaintiff's royalty payments until 1999 when an outside audit triggered its current position. Defendant rejoins that from 1992

---

**3.** These sections read:

1.1 Licensed Patent(s) shall mean U.S. Patent Applications SN# 769,016 filed August 26, 1985, all divisions, continuations and continuations-in-part of such patent application, including without limitation, SN# 937,925 filed December 4, 1986 and SN# 084,055 filed August 11, 1987, where the making, using or selling of the invention in such continuations-in-part would be covered by a claim in such patent applications or their divisions, and the corresponding foreign patent applications identified in the attached Schedule, and all patents issuing from such applications and all reissues, renewals and extensions of such patents.

1.2 Licensed Product shall mean the antiviral composition(s) claimed in Licensed Patent(s) during its pendency as a patent application and, after issuance of such application as a patent, such composition whose manufacture, use or sale, except for the license right granted herein, would infringe a valid and enforceable claim of a Licensed Patent(s).

**4.** *See* U.S. Patent No. 4,861,759 (issued August 29, 1989).

**5.** U.S. Patent Application No. 06/769,016.

**6.** Under section 4.6 of the Agreement, plaintiff was required to report the "amount of Licensed Product made, used, sold or otherwise disposed of" within the Licensed Territory, the Net Sales thereof separated between sales outside and within the United States, and the amount of royalty then due.

**7.** Defendant disputes this note's qualification as an explicit statement of plaintiff's belief that royalties were not due for countries where there is a patent application pending, as well as not due where no application was filed. The credit taken by plaintiff was for royalties previously paid in Denmark, Finland and Iceland, where patent applications for the Licensed Product have never been filed. Thus, according to defendant, the issue of whether royalties were owed for patent pending countries was not reached at that time.

**8.** The specific countries were Switzerland, Germany, Italy, France, Sweden, the Netherlands, and the United Kingdom.

through 1999, plaintiff did not report fully the worldwide Net Sales of all Licensed Product produced in the United States, which is a Licensed Territory.

A February 11, 1997 letter signed by George H. Keller, Ph.D., OTT's Technology Licensing and Monitoring Specialist, requested that all licensees conduct an independent audit if they had licensed properties that had been in commercial production for at least one year and had annual sales of $2 million or more. The licensees could deduct the audit costs from future royalty payments, unless it was determined that the licensee had been under reporting. This 1997 letter was the first audit request made of plaintiff.

Plaintiff complied with the request by retaining Price Waterhouse to audit the period from January 1, 1995, to June 30, 1997. The audit results were submitted to OTT in May 1998. OTT did not find the audit satisfactory however, taking the position that plaintiff failed to provide worksheets showing how the royalties were derived and that gross sales of licensed products were not audited thoroughly. In a letter dated January 11, 1999, OTT informed plaintiff that because of the "poor quality and the cost of the audit," OTT would only credit $5,000.00 of the $46,000.00 audit cost, and that an outside audit by AAS License Properties Management, Inc. ("AAS") would commence.

AAS conducted an audit of plaintiff's records from January 1, 1996, through December 31, 1998. AAS's audit was submitted to OTT on March 3, 1999, finding that from mid–1996 through mid–1998, plaintiff had omitted sales of $139 million and underpaid royalties in the amount of $6.95 million. "According to discussions with AAS auditors, [plaintiff] consistently failed to report significant sales in countries where the equivalents of U.S. Patent No. 4,861,759 had not issued and royalties were not paid on those sales." Declaration of George H. Keller, June 21, 2000, ¶ 14. Mr. Keller relates that the audit report recommended to the NIH that plain-

tiff " 'should remit the unpaid royalties of $6.95 million or explain why this amount is not due and owing.' " Keller Decl. ¶ 15.[9]

Consequent to the AAS audit findings, OTT's and plaintiff's officials met on April 12, 1999, when OTT informed plaintiff that, based on an extrapolation of the data in the AAS audit report back to 1991, plaintiff owed approximately $12 million in unpaid royalties. During the meeting, plaintiff's Associate Director of Licensing, M. Dianne DeFuria, shared with OTT plaintiff's own calculations of the royalty amounts due for "Non–Patent Related Countries." Plaintiff's calculated total was $9.15 million. Ms. DeFuria also showed OTT a royalty table based on sales from 1991 to 1998.

On April 22, 1999, OTT sent plaintiff a letter requesting that plaintiff pay the Government $9,178,046.00. OTT arrived at this figure by starting with the AAS audit number, $6.95 million, and adding $2.2 million, which OTT assessed for 1991 through 1995 from the table that plaintiff provided, plus the audit and labor costs of $28,046.00. The letter also stated that payment was due by May 24, 1999, "to remain in compliance with the license agreement."

Plaintiff disputed OTT's conclusions and requested a copy of the AAS audit report, which it received with a letter dated June 4, 1999. Plaintiff had multiple complaints about the AAS audit; the most pertinent to the case at bar was that the audit assumed that royalties should be paid on unissued patent applications. Representatives of OTT and plaintiff met in an attempt to settle the dispute on June 29, 1999. After the meeting plaintiff gave OTT various supplemental submissions on topics discussed during the meeting, including possible errors in the AAS audit as well as plaintiff's 1992 alleged explicit statement that it believed that royalties were not due for unissued patent applications. Despite the efforts of both parties, settlement was not reached. On July 23, 1999, OTT reclaimed the patent prosecution for the Licensed Patents from plaintiff's outside counsel due to the pending litigation.[10]

---

9. OTT charged plaintiff the $28,046.00 AAS audit cost because of the alleged under-reporting. *See* *supra* note 1.

10. Plaintiff's outside patent counsel had been prosecuting the patents from approximately April 30, 1990 through July 23, 1999.

OTT accepted *in toto* the findings of Dr. Keller and the AAS audit report by letter dated September 20, 1999, concluding that plaintiff owed the full $9,178,046. The letter stated that the

> license intent and language reflect that royalties were to be paid in any instance where a patent application was pending or a patent had been issued.... In light of this determination, information has been submitted to the NIH Debt Collection Officer regarding the establishment of a debt owed to the Government.

In his letter of September 22, 1999, NIH Debt Collection Officer Richard A. Nelson advised plaintiff that payment was expected by October 22, 1999 in order "to remain in compliance with the license agreement."

Plaintiff considered that, for two reasons, it had no option but to pay the sums under protest and then file suit. First, OTT's letters stated that failure to pay the sum would render plaintiff not compliant with the Agreement. Non-compliance might have exposed plaintiff to liability, such as breach of contract, which would allow OTT to terminate the Agreement under Section 9.1(d).[11] Second, simultaneous with the royalty disputes, plaintiff and OTT were conducting discussions regarding another licensing opportunity. Because OTT has a policy of not entering into license agreements with parties that are delinquent in the payment of any fees and royalties under a current license, plaintiff viewed non-payment as precluding automatically any further negotiations.

Plaintiff wired $9,178,046.00 to the Government on October 22, 1999, following the instructions of the September 22 letter. The payment was made under protest, with a full reservation of rights, and this lawsuit followed.

---

11. Plaintiff advises that termination of the Agreement could jeopardize the supply of ddI "to AIDS patients worldwide who depend on the product to maintain and improve the quality of their lives" and thus it "would take no action having such potential consequence." Pl.'s Br. filed May 16, 2000, at 11.

## DISCUSSION

Contract interpretation is a question of law and thus presents an appropriate question for resolution on summary judgment. *See Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed.Cir.1996); *Government Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n. 1 (Fed.Cir.1988). The court's examination begins with the plain language used by the parties in contracting. *See Textron Defense Sys. v. Widnall*, 143 F.3d 1465, 1468 (Fed.Cir.1998); *Aleman Food Servs., Inc. v. United States*, 994 F.2d 819, 822 (Fed.Cir.1993). When the contract language is unambiguous, the court's inquiry is at an end and the plain language of the contract is controlling. *See Textron Defense Sys.*, 143 F.3d at 1469.

The contract language is given its ordinary meaning unless the parties mutually intended and agreed to an alternative meaning. *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed.Cir.1998). A contract term is unambiguous when there is only one reasonable interpretation. *See Triax Pac., Inc. v. West*, 130 F.3d 1469, 1473 (Fed.Cir. 1997); *A–Transport Northwest Co., Inc. v. United States*, 36 F.3d 1576, 1584 (Fed.Cir. 1994); *see also Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993) (noting that contract is ambiguous where two reasonable interpretations are consistent with contract language). The mere fact that the parties may disagree with regard to the interpretation of a specific provision does not, in and of itself, render that provision ambiguous. *See Community Heating & Plumbing*, 987 F.2d at 1579; *Brunswick Corp. v. United States*, 951 F.2d 334, 337 (Fed.Cir.1991).

If, however, a latent ambiguity arises when interpreting a contractual provision, the proper interpretation is the reasonable and internally consistent one.[12] *See Brunswick Corp.*, 951 F.2d at 337. The joint

---

12. An ambiguity may be either patent or latent. A patent ambiguity is considered so obvious as to raise the duty to inquire, whereas a latent ambiguity is not glaring or substantial. *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed.Cir.1996); *Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed.Cir.1992).

intent of the parties, if ascertainable, is decisive. *See Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed.Cir.1986). " 'It is the general law of contracts that in construing ambiguous and indefinite contracts, the courts will look to the construction the parties have given to the instrument by their conduct before a controversy arises.' " *Id.* (quoting *United States v. Cross*, 477 F.2d 317, 318 (10th Cir.1973)); *see Highway Prods., Inc. v. United States*, 208 Ct.Cl. 926, 938, 530 F.2d 911, 917 (1976) ("Where there is an ambiguity in the contract instrument, it is appropriate to go outside the formal documents and ascertain the intent of the parties ...."). If an ambiguity inheres in the contract and extrinsic evidence does not establish clearly the parties' intent, the ambiguity is construed against the drafter of the language under the doctrine of *contra proferentem. See Studiengesellschaft Kohle, M.B.H. v. Hercules, Inc.*, 105 F.3d 629, 634 (Fed.Cir. 1997) (citing *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 398 (Del.1996)).

### 1. *The plain meaning of the contract language*

Plaintiff's interpretation of when royalties are due under the Agreement hinges on the words "valid claim," as well as two introductory phrases in section 4.4. Plaintiff argues that the construction of section 4.4 bases royalty payments on Net Sales subject to, and limited by, the three conditions listed after the clause "provided, however," which are

> that the Licensed Product sold is covered by a valid claim of a Licensed Patent(s), or made or used by a process covered by a valid claim of a Licensed Patent(s), or is sold under circumstances which, if unlicensed, would otherwise constitute infringement of a valid claim in a Licensed Patent(s).

Because the Agreement did not define the term "valid claim," plaintiff posits that the generally accepted legal definition of valid claim applies. As a result, no legally valid claims would exist until the issuance of a patent.

Plaintiff relies on statutory and case law to support its contention. The wording of the proviso, by discussing Licensed Product "sold," "made," or "used," closely parallels the language describing the statutory scope of patent protection. *See* 35 U.S.C.A. § 154(a) (Supp.2000) (patent grants to patentee, heirs or assigns right to exclude others from "making, using, ... or selling the invention throughout the United States ...."). Thus, according to plaintiff, the wording that invokes standards from the patent statute logically should also invoke the statutory definition of valid claim. *See* 35 U.S.C.A. § 282 (Supp.2000) (issued patent presumed valid and each claim within the patent presumed valid independent of other claims). Case law, in both interference and infringement actions, interprets the statutory presumption of patent validity to mean that no valid claim can arise until a patent issues. *See Price v. Symsek*, 988 F.2d 1187, 1193 (Fed.Cir.1993) ("An interference involving an already issued patent embraces the societal interests derived from the statutory presumption that an issued patent is valid."); *see also GAF Bldg. Materials Corp. v. Elk Corp.*, 90 F.3d 479, 482 (Fed.Cir.1996) ("A declaratory judgment of 'invalidity' or 'noninfringement' with respect to [the] pending patent application would have had no legal meaning or effect.").

An apparent vulnerability in plaintiff's argument is that its interpretation appears to be inconsistent with the definitions for Licensed Patent(s) (section 1.1) and Licensed Product (section 1.2), which explicitly include pending patent applications, divisions, continuations, and continuations-in-part.[13] Defendant asserts that plaintiff wanted "the benefit of all exclusive rights associated with these patents, whether issued or not." Def.'s Br. filed June 30, 2000, at 13. In consideration for this broad scope of rights, defendant contends that the Government was to receive royalties for Licensed Product that had been manufactured in the United States, where the composition patent has been pending for the past 15 years, regardless of where the Licensed Product was sold.

According to defendant, plaintiff's interpretation of section 4.4 "renders essential

---

**13.** *See supra* note 3.

terms in the Agreement meaningless," and "reads 'Patent Application' out" of sections 1.1 and 1.2. Def.'s Br. filed June 30, 2000, at 14, 15. However, plaintiff's plain meaning interpretation of "valid claim," while restricting the meaning of Licensed Patent(s) and Licensed Product in the royalty provision, does not alter their definitions for the remainder of the Agreement. For example, section 2.1 grants an "exclusive license under the Licensed Patent(s) to make, have made, use and sell Licensed Products ...." The definitions in sections 1.1 and 1.2 are applicable to section 2.1, as they are to all other provisions of the contract containing those terms. Thus, although plaintiff's interpretation does not distort the meaning of sections 1.1 and 1.2 throughout the entire contract, the limited breadth of sections 1.1 and 1.2 under plaintiff's interpretation of "valid claim" cannot be accepted as a plain meaning of the language.

While defendant concedes that claims of an issued patent are presumed to be valid under 35 U.S.C.A. § 282, it maintains that the meaning of "valid claims" advanced by plaintiff cannot be the basis for ignoring "patent application" in the definitions of Licensed Product and Licensed Patent(s). Defendant finds that the only way to give "reasonable meaning" to all of the contract terms is to construe "valid claims" to mean different things depending on the context. For a "valid claim" with respect to issued patents, defendant essentially adopts plaintiff's meaning: A claim that has not been held invalid in a final decision by a court with jurisdiction. However, in the context of patent applications, defendant asserts that "valid claim" that "has not been abandoned without the possibility of revival, pursued through a timely filed continuation or divisional application, or finally disallowed without the possibility of

appeal." Declaration of Robert Auber, June 21, 2000, ¶ 8.

Defendant's proposed two-definition scheme for "valid claim" in the contract is a strained attempt to avoid the single meaning that the body of patent law has given to "valid," and makes the presence of "valid claim" in section 4.4 superfluous. Defendant cites no legal authority for assigning two different meanings to one term in the same contract.[14] Furthermore, defendant's proposed meaning for "valid claim" is useless as a limitation in conjunction with the definition of Licensed Patent(s). Any patent application claim that has been withdrawn, abandoned, canceled, disclaimed, rejected and not appealed necessarily is no longer a part of the patent application, no longer a part of the Licensed Patent, and therefore outside the scope of the Agreement. Defendant's meaning of "valid claim" would include even pending claims challenged in an interference action.[15] In essence, defendant asks that the presumption of validity for issued patents be extended backwards in time to presume that all unexamined claims in pending patent applications are valid.

■ An interpretation that gives reasonable meaning to all contract parts is preferred over an interpretation that leaves a portion of the contract " 'useless, inexplicable, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.' " *See Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991) (quoting *Arizona v. United States*, 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978)). Not only should the court read the contract as a whole, but it must interpret provisions in a manner to avoid conflicts between other provisions within the contract. *Reliance Insurance Co. v. United States*, 931 F.2d 863, 865

---

**14.** In *Craft Machine Works, Inc. v. United States*, 926 F.2d 1110 (Fed.Cir.1991), a case not cited by defendant, the court held the definition of "supplies" could vary contextually in a procurement contract relying on 48 C.F.R. (FAR) § 2.101 (1999). FAR § 2.101 specifically provides that the terms defined in the subpart are to mean the same throughout the regulation "unless (a) the context in which they are used clearly requires a different meaning or (b) a different definition is prescribed for a particular part or portion of a

part." Neither party argues that a similar directive applies to this Agreement.

**15.** An interference action occurs when an examiner determines that an application is similar to, or would "interfere with" another pending patent or unexpired patent. The board of patent interferences then conducts a hearing, open to both parties, in order to determine which application has priority. *See* 35 U.S.C.A. § 135 (Supp.2000).

358

(Fed.Cir.1991) (citations omitted). Neither party's proffered definition of "valid claim" is satisfactory as they both require straining another portion of the contract. Of course, the contracting parties can define terms to mean whatever they wish, but such an intent was not implemented in the case at bar.

### 2. *The proviso*

Plaintiff's construction of section 4.4 as requiring royalties on Net Sales subject to three conditions, or a "proviso," is convincing. As a matter of context and sentence structure, the phrase "provided, however" implies that a limiting condition will follow. *See Suburban Transfer Service, Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 224 (3d Cir. 1983) ("The words 'provided, however,' have been historically read by courts as establishing conditional clauses in written agreements.") (citations omitted). Moreover, plaintiff's interpretation of "valid claim" does not conflict with the definitions of Licensed Patent(s) and Licensed Product, but, rather, creates a limit on when royalties on Net Sales are due, as implied by the introductory clause. In contrast, defendant's definition of "valid claim" with respect to patent applications does not create any limit at all, as an invalid patent application claim is simply no longer a part of the application.

Plaintiff also posits that the phrase "otherwise constitute infringement of a valid claim" buttresses its argument that royalties are based on issued patents. According to plaintiff, the use of "otherwise" in the third phrase of the proviso signals that the first two phrases implicate circumstances in which infringement would occur. Thus, plaintiff argues that the three conditions are in a categorical series linked by the word "otherwise," and that the reverse of the interpretive maxim *ejusdem generis* supports this interpretation.[16] Plaintiff relies on *Dong v. Smithsonian Inst.*, 125 F.3d 877 (D.C.Cir.1997), in

which the court, while discussing statutory construction, applied a "reverse *ejusdem generis*" principle to find that the broader category could help define the scope of the specific examples. *Id.* at 879–80. The court reasoned that "'the phrase 'A, B, or any other C' indicates that A is a subset of C.'" *Id.* (quoting *United States v. Williams–Davis*, 90 F.3d 490, 508–09 (D.C.Cir.1996)). Similarly, plaintiff reasons that the sale, production, or use of the product should be characterized only as forms of infringement, rather than as the unadorned, and therefore broadest, definition of the words.

Defendant disagrees that the proviso portion of section 4.4 is an enumeration of things concluding with a broader term intended to define the preceding phrases. In defendant's view, separating the three phrases with "the disjunctive, 'or'" enables each provision to be read separately and not as a link in a series. Thus, defendant reads the first two phrases as applying to processes or products covered by valid claims of patent applications or issued patents within the definition of Licensed Patent(s). The third phrase, because of its mention of infringement, therefore would apply only to valid claims of issued patents. Defendant reasons that the purpose of the third phrase was to be a catch-all to protect plaintiff's rights in the Licensed Patent(s) and Licensed Products if a statutory expansion of patent rights came into effect.[17]

The court concludes that plaintiff's interpretation of the proviso is consonant with its plain meaning. The meaning of these three phrases in the proviso derives from grammatical context. The third differs from the second only in that it contemplates sales of an unlicensed product. Defendant's argument divides these elements of a series in an attempt to add strength to its bifurcated definition of "valid claim." Defendant's argument based on the proviso does not advance

---

**16.** The Latin phrase *ejusdem generis* means of the same kind, class, or nature. In the context of legal instruments, "the *'ejusdem generis* rule' is that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest context, but are to be held as applying only to persons or things of the same general kind or class as those specifi-

cally mentioned." Black's Law Dictionary 517 (7th ed.1999).

**17.** In 1994, for example, 35 U.S.C. § 154(a) was amended to include the right to exclude others from "offering for sale" and "importing" into the United States products covered by the patent. *See* Pub.L. 103–465 § 532(a) (1994).

its position that the clear meaning of the Agreement was to cover the pendency phase.

### 3. *Trade use*

While plaintiff's plain language reading of section 4.4. seems more reasonable than defendant's, each party's interpretations require distorting another part of the contract. The Federal Circuit held recently that "excluding evidence of trade practice and custom because the contract terms are 'unambiguous' on their face ignores the reality of the context in which the parties contracted." *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed.Cir.1999). In *Metric Constructors* the Government cancelled several sections of a contract which provided that "[n]ew lamps ... be installed immediately prior to completion of the project" and sought a deduction from the contract price equivalent to the cost of replacing every light bulb. The language unambiguously seemed to require the replacement of all light bulbs before the end of the construction. However, after discussing two divergent lines of cases regarding the role of trade practice evidence in contract interpretation, the court held that " 'the context and intention [of the contracting parties] are more meaningful than the dictionary definition.' " *Id.* at 752 (quoting *Rice v. United States*, 192 Ct.Cl. 903, 908, 428 F.2d 1311, 1314 (1970)). Considering the evidence of trade usage and custom in the record,[18] the appellate court ruled that the contract contained a latent ambiguity and thus applied *contra proferentem*.[19]

 Of course, a party is not permitted to invoke trade custom to create ambiguity regarding a term that is not reasonably open to different interpretations, *Jowett, Inc. v. United States*, 234 F.3d 1365 (Fed.Cir.

2000), but an examination of the context in fact may show that certain contract terms were less than clear at the time of contracting. *Metric Constructors* at 751. "[A] court should accept evidence of trade practice only where a party makes a showing that it relied reasonably on a competing interpretation of the words when it entered into the contract." *Id.* at 752. Both parties have submitted declarations attesting to their respective intent regarding royalty payments at the time of contracting. William T. Comer, Ph.D., plaintiff's Senior Vice President of Licensing at the time of the negotiation, states that he and other employees of plaintiff considered "valid claim" in section 4.4 to apply only to an issued patent. Declaration of William T. Comer, Ph.D., Aug. 8, 2000, ¶ 4. Furthermore, Mr. Comer was not aware of any representative of NTIS indicating that "valid claim" would apply to a pending patent claim. *Id.* Defendant's former employee Mr. Auber, a licensing specialist at NTIS during the negotiation of the Agreement, states that "[i]t was NTIS' intention, my belief, and also BMS' understanding, that royalties would be due from the first commercial sale of ddI and/or ddA. Specifically, royalties were to be calculated under [section] 4.4 based on claims of both issued patents and patent applications." Auber Decl. ¶ 8.

 Interpretation of the contract should accord with the views expressed by the parties during performance of the contract. *Sperry Corp. v. United States*, 845 F.2d 965, 970 (Fed.Cir.1988) (citing *General Warehouse Two, Inc. v. United States*, 181 Ct.Cl. 180, 187, 389 F.2d 1016, 1020 (1967)). However, in the case at bar, neither party acted consistent with its bright-line interpretation of the contract. The record shows that

---

**18.** The findings included evidence that the term "relamping" was commonly used in the industry to mean the "total replacement of lamps at a particular facility," as well as "[e]vidence showing that neither [plaintiff's] project manager nor its president had ever seen a requirement to relamp a newly constructed facility in forty-five years of combined experience." *Metric Constructors* at 750.

**19.** The holding in *Metric Constructors* was recently revisited in *Jowett, Inc. v. United States*,

234 F.3d 1365 (Fed.Cir.2000). The *Jowett* court emphasized that *Metric Constructors* does not stand for the proposition that a contract is ambiguous if the language does not reflect industry practice. "Here there is no term in the contract that has an accepted industry meaning different from its ordinary meaning." *Jowett, Inc.*, 234 F.3d at 1369. In the case at bar, however, the undefined term "valid claim" with its accepted industry usage, creates the ambiguity.

plaintiff paid royalties for sales in non-patent countries and that OTT waited nearly ten years to protest plaintiff's royalty calculations.

Without question the contract as written does not implement either party's intent. While arguing divergent positions on the plain meaning of the contract language, they both address trade custom. During oral argument, plaintiff discussed trade usage of the disputed term. In patent law the claims of issued patents are discussed in terms of validity, whereas the claims of patent applications are discussed in terms of patentability. Transcript of Proceedings, *Bristol–Myers Squibb Co. v. United States,* No. 99–923C, at 10, 11, 12, 17, 18, 28, 34, 45, 53, 56 (Fed.Cl. Nov.17, 2000). This divide in terminology between patent pendency and issuance is statutory. *See* 35 U.S.C.A. §§ 101–146 (Supp.2000). In order for a disclosed invention to become an issued patent with presumptively valid claims, a patent examiner must determine if certain criteria have been met. Indeed, the "presumption of validity is based on the presumption of administrative correctness of actions of the agency charged with examination of patentability." *Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.,* 98 F.3d 1563, 1569 (Fed.Cir.1996) (citing *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir.1985)). Section 11.1 of the Agreement itself furthers plaintiff's position concerning trade usage. By stating that "NTIS does not warrant the patentability or validity of the Licensed Patent(s)," the Government denies liability for a patent application that is rejected ("patentability"), as well as for a patent that loses an infringement battle ("validity").

Defendant included two legal theory publications to support its interpretation of the Agreement. First, defendant cited a generic Pharmaceutical License Agreement, published in 1996, which contained its desired definition of "valid claim." 8 No. 3 J. Proprietary Rts. 14, ¶ 1.9 (Mar.1996).[20] This document was not a part of the parties' negotiations, nor otherwise incorporated into the Agreement, although evidently it should have been. The generic agreement provided by defendant is not germane to the facts of this case.

Defendant also quoted a treatise on licensing to demonstrate that "payments prior to patent issuance can be predicated upon such bases as an option to practice under the patent, when issued, or upon the disclosure of a trade secret contained in the patent application." Roger M. Milgram, 2 *Milgram on Licensing,* § 8.08, at 8–31 (2000). The treatise offered this statement to show that royalty payments can be made for a pending patent, but it does not lend support to the proposition that this arrangement is customary. Furthermore, the treatise points out that, although payments may be made, "patent royalties" are not applicable to the pendency period because a patentee's exclusive statutory rights historically have only come into being after the patent has issued.[21] However, the reference cited in the licensing treatise, coupled with the Agreement being exclusive for only ten years from the date of first commercial sale, is consistent with defendant's position.

■ Responsibility for the drafting of section 4.4 is relevant once the court rules that the contract language is ambiguous. However, it is doubtful that the general rule of *contra proferentem,* which construes contract ambiguity against the drafter, can be applied in this case.[22] "[W]hen the contract terms are negotiated, *contra proferentem* is inapplicable." *See Cray Research, Inc. v. United States,* 44 Fed.Cl. 327, 330 (citing

with its accepted industry usage, creates the ambiguity.

**20.** " 'Valid Claim' means a claim of any unexpired United States or foreign patent or patent application which shall not have been withdrawn, canceled, or disclaimed, nor held invalid by a court of competent jurisdiction in an unappealed or unappealable decision." *See* 8 No. 3 J. Proprietary Rts. 14, ¶ 1.9 (Mar.1996).

**21.** At the time the parties entered into the Agreement, the duration of exclusive patent rights was 17 years from the time of patent issuance. *See* 35 U.S.C. § 154 (1984). However, in 1994, Congress amended 35 U.S.C. § 154, changing the patent term to 20 years from the earliest filed priority application. *See* Uraguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (Dec. 8, 1994); 35 U.S.C. § 154 (1994 & Supp. IV 1998).

**22.** *See Studiengesellschaft Kohle,* 105 F.3d at 634.

*Consumers Ice Co. v. United States,* 201 Ct.Cl. 116, 122–23, 475 F.2d 1161, 1165 (1973)). Plaintiff asserts that defendant "drafted this provision of the contract and it was not the subject of negotiation between the parties." Pl.'s Statement of Facts, filed Aug. 10, 2000, ¶ 16. Plaintiff's Associate Director of Licensing at the time of the negotiations, Ms. DeFuria, avers that "there were no discussions between [plaintiff] and NTIS regarding the royalty terms (Article IV), [or] definitions (Article I) … prior to NTIS's presentation of a draft of what became the License Agreement." Declaration of M. Dianne DeFuria, May 10, 2000, ¶ 2. Mr. Auber counters that "[s]ome form of the language in [section] 4.4 was most probably proposed by [plaintiff]. The final language was arrived at by negotiation." Auber Decl. ¶ 7. In support of its contention that the contract was a product of negotiation, defendant submitted a copy of the first draft of the Agreement drafted by the Government. The term "valid claim" was not in the royalty provision of the initial draft, whereas the definition of Licensed Patent(s) did include mention of patent applications.

 In a summary judgment analysis, the court neither may make credibility determinations nor weigh evidence and seek to determine the truth of the matter. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, it is within the trial court's discretion to deny summary judgment if "there is reason to believe that the better course would be to proceed to a full trial." *Id.* Resolution of this case will turn on testimony due to an apparent absence of contemporary documentation. Plaintiff and defendant will be required to offer witnesses, over a decade after the fact, to establish whether or not the parties negotiated the language of the critical definitions. If the court finds that the terms were the subject of negotiations, the role of trade practice will loom large in ascertaining the parties' intent— again, trade practice over a decade past. In these circumstances, because this Agreement did not clearly advance either party's preferred reading, they might well consider disposition short of trying stale facts.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. The parties' cross-motions for summary judgment are denied.

2. A status conference shall be held at 2:30 p.m. on Friday, January 19, 2001, in the Howard T. Markey Building. Counsel shall be prepared to set the dates for all pretrial proceedings and trial.