**TEXTRON DEFENSE SYSTEMS,**
Appellant,

v.

**Sheila E. WIDNALL, Secretary of the Air Force, Appellee.**

No. 96–1535.

United States Court of Appeals, Federal Circuit.

May 7, 1998.

Paul C. Hill, Providence, RI, argued, for appellant. Of counsel on the brief was Carl

G. Buzawa, General Counsel, Textron Defense Systems, Wilmington, MA.

Sharon Y. Eubanks, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, argued, for appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, James M. Kinsella, Assistant Director, and William C. Lindsey, Trial Attorney. Of counsel on the brief were William F. Manley, and Jerome C. Brennan, Office of Counsel, Defense Logistics Agency, Defense Contract Management Command East District, Boston, MA.

Before NEWMAN, PLAGER, and SCHALL, Circuit Judges.

PLAGER, Circuit Judge.

This case involves a research and development contract funded by the Strategic Defense Initiative Office ("SDIO") as part of the so-called 'Star Wars' anti-ballistic missile defense system. In a decision by the Armed Services Board of Contract Appeals ("the Board") dated May 2, 1996, ASBCA Nos. 47352 and 47950, the Board denied Textron's appeal for payment of additional costs and fees on a cost-plus-award-fee ("CPAF") contract. Because Textron received all that it was entitled to under the language of the contract, we affirm.

## BACKGROUND

The United States Air Force (hereinafter "Government") awarded the CPAF contract to Textron's predecessor in interest, AVCO Everett Research Laboratory, Inc., on November 8, 1984, with an effective date of September 18, 1984. The subject of the contract was the research and development of an excimer laser device ("EMRLD") that could be used as part of the Star Wars program. The stated objective of the contract was "technology development and laser system design leading to the demonstration of a closed cycle repetitively pulsed electron beam pumped excimer laser."

The contract incorporated the DAR 7–402.2(c) Limitation of Funds ("LOF") (1966 OCT) clause, the DAR 7–203.10 Termination (1973 APR) clause, the DAR 7–105.3(c) Stop Work Order (1971 APR) clause, and a version of the AFSC DAR 7–150.3 Award Fee (1977 DEC) clause. The CPAF contract called for a zero base fee and an Award Fee not subject to the Termination or Disputes clauses as to the payment and amount of the award fee, respectively.

The original estimated cost of the contract, as awarded, was $53,144,000. This estimate was revised upwards as a result of a series of contract modifications to a final total of $132,618,264. The contract was incrementally funded. The contract schedule at award allotted only $3,457,992 to the contract. Subsequent adjustments brought the total allotted amount to $113,479,301. Each award fee allotment was made by a contract modification which stated that it was issued pursuant to the Award Fee clause of the contract. All other allotments were made pursuant either to the LOF clause or the Changes clause.

The contract created a series of award fees (i.e., profit) that Textron was eligible to receive at the end of each performance period based on its performance during that period. The decision as whether Textron would receive any such award, and if so, how much, was left to the discretion of a Fee Determining Official ("FDO") based on the FDO's assessment of Textron's performance in several specified areas. Initially, the contract specified four performance periods, with the maximum award fees available in each as follows:

| Period | Maximum Award Fee |
|--------|-------------------|
| 1 | $3,095,630 |
| 2 | $3,018,442 |
| 3 | $1,508,560 |
| 4 | $ 348,964 |

That award fee schedule was changed on August 3, 1988, pursuant to bilaterally executed Modification P00057. The Modification increased the number of performance periods from four to seven and 'back end-loaded' the award fees in order to create more incentives in the later stages of the program. The revised plan provided for the following:

| Period | Maximum Award Fee |
|--------|-------------------|
| 1 | $1,000,000 |
| 2 | $1,100,000 |
| 3 | $1,200,000 |
| 4 | $2,000,000 |
| 5 | $4,000,000 |
| 6 | $6,484,656 |
| 7 | $1,000,000 |

Under the revised schedule, approximately $11.5 million of the possible $16.8 million was available in the last three periods (i.e., periods five through seven). Modification P00057 retained the discretionary award fee determination scheme of · the original plan. Of the $5.3 million available for award fees in periods one through four, Textron was only awarded approximately $2.5 million, or less than 50% of the amount available.

Funding the program was a constant struggle. From the summer of 1985 through the end of 1987, Textron's expenditures under the contract exceeded the allocated funding. Textron did not stop work or request the contracting officer to terminate the contract when those overruns occurred, apparently under the assumption that further funding would be allocated. On several occasions those assumptions turned out correct. However, there were no assurances ever given by the contracting officer that future overruns would be covered.

Even before the contract was awarded, the contracting officer informed Textron that "SDI[O] might not continue funding" of EMRLD. In the same notice, the contracting officer urged Textron to "pay particularly close attention to the 'Limitation of Funding' clause." During the course of the contract, the contracting officer repeatedly reminded Textron that the LOF clause was in effect. On one occasion, after learning that Textron was operating in a cost-overrun situation, the contracting officer warned Textron that "*any work performed beyond the funding limit* is at *your* own *risk*, as there is a possibility that additional funds may not be made available."

The funding situation became even more tenuous in the fiscal years after 1987 because funding was no longer being provided by SDIO or the Air Force. Instead, the funds, if any, were to be congressionally directed. In an internal memorandum, Textron acknowledged the difficulty it faced obtaining future funding on "the Hill," unless it could "find a champion in the Air Force or SDIO."

Textron completed the fourth performance period on September 15, 1989 and began work on the fifth performance period. About that same time, Congress decided not to provide specific funding for EMRLD in fiscal year 1990. Accordingly, by letter dated September 29, 1989—a mere two weeks into the fifth performance . period—the Government directed Textron to stop all work effective October 1, 1989. Textron was permitted to perform specific close-out work, which had been separately funded by a final allotment under the LOF clause by unilateral modification P00071. On December 28, 1990, the contracting officer terminated for the convenience of the Government all remaining work under the contract, with the exception of certain atmospheric tests that are not relevant here.

On December 19, 1990, Textron submitted a termination settlement proposal to the Government. That proposal requested $13,428,-348 over and above the $113,479,301 paid to date under the contract. At that time, the total allowable costs incurred by Textron in performing the contract, including termination costs, were $112,190,867. When the parties were unable to agree on a settlement, Textron submitted a certified termination claim to the contracting officer in the amount of $10,225,925. That claim included $1,368,-389 for unreimbursed costs and $8,857,536 in additional award fee. The award fee claim was arrived at by multiplying the percent of contract completion (77.4%) by the total award fee pool available for periods five through seven ($11.4 million). By final decision dated February 14, 1994, the contracting officer allowed Textron a total of $110,958,-138 in costs and $2,251,163 in award fees, and denied its claim for any additional costs and fees.

Textron appealed the final decision to the Board. The Board affirmed the contracting officer's final decision with regard to both costs and award fees. *See Textron Defense Sys.*, ASBCA Nos. 47352 & 47950, 96–2 BCA ¶ 28,332. Textron now appeals that decision to this court.

## DISCUSSION

Textron advances two principal arguments before this court, as it did before the Board. The first is that, under the contract's Termination clause, Textron is entitled to a pro-rata share of the award fee based on the percentage completion of the contract because the Government terminated the contract for convenience. The second is that it

is entitled to recover additional costs under the LOF clause up to the total amount allotted to the contract including award fees. We have jurisdiction under 28 U.S.C. § 1295(a)(10) (1994). We consider each argument in turn.

## I.

This is a contract dispute; we look to the language of the contract to resolve it. Contract interpretation is a question of law over which we exercise complete and independent review. *See* 41 U.S.C. § 609(b) (1994); *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed.Cir.1996). Though not binding upon us, the views of the Board are given careful consideration. *See Fortec Constructors v. United States,* 760 F.2d 1288 (Fed.Cir.1985).

The Board concluded that Textron was not eligible for a further award fee as a matter of right upon termination for the convenience of the Government because the award fee clause of the contract was expressly made inapplicable to the termination clause. The relevant provision states:

> (j) *Payment of any Award Fee* to the contractor hereunder, as determined by the Fee Determining Official, *will not be subject to the clauses of this contract entitled* "Allowable Cost, Fixed Fee and Payment" and *"Termination."*

(Emphasis added.) The plain language of the contract clearly exempts the Award Fee from the Termination clause of the contract. Textron would have us read this contract provision out of the contract. Such a reading is impermissible. *See Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir. 1985).

Even if we were to assume that the Termination clause applied, Textron would not be entitled to a percentage of the total award fee because it had no reasonable expectation of ever receiving the total award fee. It is for this reason that Textron's reliance on authority involving cost-plus-fixed-fee ("CPFF") and cost-plus-incentive-fee ("CPIF") contracts is misplaced. In both CPFF and CPIF contracts, the contractor has a reasonable expectation of receiving at least a portion of the fee. For a CPFF contract the fixed-fee is determined at the

beginning of the contract, and both parties know that if the contractor completes the contract then the contractor will receive the fixed fee. The same is true of the "target fee" in a CPIF contract. *See* 48 C.F.R. § 49.115(b)(2) (1996). Accordingly, upon termination for convenience the contractor has a reasonable expectation of receiving some portion of either the fixed fee or the target fee. The regulations and case law reflect this expectancy. *See id.; North Am. Rockwell Corp.,* ASBCA No. 14329, 72–1 BCA ¶ 9,207. A contractor has no such reasonable expectation in a CPAF contract.

Beyond that, the award fee in a CPAF contract is the functional equivalent of the "incentive fee" in a CPIF contract, rather than the "target fee," because both the award fee and the incentive fee are discretionary whereas the target fee is fixed. It is well established, both by regulation and by case law, that a contractor is not entitled to a portion of the incentive fee upon termination of a CPIF contract for convenience. *See* 48 C.F.R. § 49.115(b)(2) (1996); *Salsbury Indus. v. United States,* 905 F.2d 1518, 1522 (Fed.Cir.1990). Thus even under the Termination clause a contractor in a CPAF contract is not entitled to a specific share of an award fee.

Textron argues that it repeatedly sought clarification of the contract language from the Government to determine whether the entire award fee would be available in the event of a termination. According to Textron, it was reasonable to assume the award fee was obtainable because the Government never stated that it would not be available. It was the Government, after all, who drafted the contract.

Textron's argument proves too much. If the contract was that ambiguous, which we do not think it is, then there was a duty on Textron to seek and obtain clarification before entering into the contract. *See, e.g., Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990 (Fed.Cir.1996). Textron cannot now argue that it would be unfair to hold it to a patently ambiguous contract. Even if we grant that Textron's assumption about the meaning of the contract was reasonable, which it is not, expectancy does not establish

entitlement to anticipated profits. See 2 Ralph C. Nash, Jr. & John Cibinic, Jr., *Federal Procurement Law* 1104 (3d ed. 1980) (In a termination for convenience, "[r]ecovery of anticipated profit is precluded.")

At bottom, Textron's argument is that it is unfair to deprive it of the opportunity to compete for the full award fee in light of the significant contract changes made during the course of the contract. The simple answer to that argument is that these are the terms to which Textron agreed. The end-loading of the award fee was a provision that Textron agreed to in a bilateral modification to the contract. Textron has not claimed duress or fraud, nor could it. The evidence reveals that this modification was the result of an arms length agreement between two sophisticated parties. That the contract was terminated does not give Textron grounds to claim foul when that possibility hovered over this project from the beginning.

## II.

■ Textron also claims that it was deprived of $1,232,729 in additional costs. Both parties agree that as of December 28, 1989, the amount paid by the Government to Textron under the contract was a total of $113,-479,301, of which $2,521,164 was paid to Textron as payment of award fees. Textron claims that the full $113,479,301 should be available to pay its costs under the LOF clause.

We again first consider the language of the contract. Because the language is sufficiently clear, our inquiry ends there as well. *See Craft Mach. Works, Inc. v. United States,* 926 F.2d 1110, 1113 (Fed.Cir.1991) ("In contract interpretation, the plain and unambiguous meaning of a written agreement controls."). The LOF clause puts a duty on the contractor to contain its costs below the amount allotted to the contract or risk bearing those costs itself:

> The Contractor agrees to perform or have performed work on this contract up to the point at which the total amount paid and payable by the Government pursuant to the terms of this contract approximates but does not exceed the total amount actually allotted to the contract.

The dispositive question then is what is the "total amount actually allotted to the con-tract." That answer is found within the four corners of the LOF clause: "It is contemplated that from time to time the additional funds will be allotted to this contract up to the *full estimated cost set forth in the schedule, exclusive of any fee.*" (Emphasis added.) We think it clear that the "total amount actually allotted to the contract" does not include "any fee," because the main purpose of the LOF clause is to prevent the contractors "costs" from exceeding the "amount allotted to the contract." In this case, the payment schedule specifically provided for an express allocation of fund allotment between costs and fees. Given this express allocation, Textron's argument that the money allocated for payment of fees should be available to pay costs is simply wrong.

Textron, nonetheless, argues that *John J. McMullen Assocs., Inc.,* ASBCA No. 22450, 79–1 BCA ¶ 13,818 and *Allied Signal Aerospace Co.,* ASBCA No. 46890, 95–1 BCA ¶ 27,462, require a different result. Textron proffers these cases as standing for the proposition that "fee payments made with allotted funds must be deemed available to reimburse costs." In the first instance, those decisions are not binding on this court. Even assuming we chose to follow them, however, they are readily distinguishable. The principal distinction between those cases and this one is that the payment schedule in this case provided for an express allocation of fund allotment between costs and fees. The Board so found and substantial evidence supports that finding. The Board in *McMullen* expressly recognized this distinction, *see McMullen,* 79–1 BCA ¶ 13,818, at 67,775 n. 3 ("We need not decide whether the result would be different if such an express allocation had been made."), while the *Allied Signal* Board distinguished another Board case, *Law Mathematics & Tech., Inc.,* ASBCA No. 29741, 85–1 BCA ¶ 17,765, on that same ground, *see Allied Signal,* 95–1 BCA ¶ 27,-462, at 136,835. Accordingly, those cases are inapplicable to the case before us, and distinguished from the plain language of the contract, to which Textron expressly agreed.

This court's recent decision in *Northrop Grumman Corp. v. Goldin,* 136 F.3d 1479 (Fed.Cir.1998), also involving a cost-plus-award-fee, is not in conflict. As noted earli-

er, these are contract cases, and each contract is different, and each contract dispute is different. In *Northrop*, the initial contract provided for a percentage distribution of the award fee based on performance. The contract was later restructured to create two separate award fee pools. Funds in one were awarded (or lost) at the end of each evaluation period; in the other, unawarded funds were carried forward for possible future award.

When the contract was terminated for the convenience of the Government, the question was whether the carried-over funds were to be transferred into the evaluation period pool in calculating the final payment under the contract. *Northrop* said yes; the Government said no; this court, as a matter of contract interpretation in light of the various contract provisions, agreed with *Northrop*. *Northrop* thus was a dispute over how to calculate the size of the award pool available for work that had been performed. In the case before us, Textron's claim is for award fees that it could have earned in future performance periods had the contract been allowed to run its full course, a quite different proposition.

We have considered Textron's other arguments and find them to be without merit.

## CONCLUSION

Textron has not met its burden of proving that the Board's decision was fraudulent, arbitrary, capricious, grossly erroneous, unsupported by substantial evidence, or otherwise not in accordance with law. *See* 41 U.S.C. § 609(b) (1994). Accordingly, the decision of the Board is

*AFFIRMED.*