**BIGHORN LUMBER CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 00–568C.

United States Court of Federal Claims.

July 12, 2001.

Scott Horngren, Portland, OR, for plaintiff.

Thomas B. Fatouros, Washington, DC, with whom was Acting Assistant Attorney General Stuart E. Schiffer, for defendant. Laurie Ristino, U.S. Department of Agriculture, of counsel.

### *OPINION*

MILLER, Judge.

This case is before the court on cross-motions for summary judgment. Plaintiff seeks from the Government legal fees in-curred after intervening in a lawsuit brought by a third party to enjoin performance of plaintiff's timber harvest contract with the Government. Argument is deemed unnecessary.

### FACTS

On May 17, 1994, the United States Forest Service (the "Forest Service") awarded the Banner Timber Sale Contract No. 02–003055 to Bighorn Lumber Company, Inc. ("plaintiff"). On June 10, 1994, Friends of the Bow and other environmental groups sued in the United States District Court for the District of Colorado to enjoin performance of the contract. *Friends of the Bow v. United States,* No. 94–Z–1370 (D. Colo., filed June 13, 1994). On June 22, 1994, the federal district court granted the injunction and thereby halted the harvest. As of December 22, 1995, with the injunction still in effect, the court granted plaintiff's motion to intervene in the *Friends of the Bow* litigation. On July 26, 1996, the district court lifted the injunction. The contract containing the language at issue was executed on September 5, 1996.

In September 1998 the parties executed a Release from Liability Statement ("release"). Plaintiff signed the release in exchange for an agreement by the Forest Service to change the termination date of the contract and the periodic payment determination dates. The release provided that, in the event the Forest Service was compelled to suspend, modify or cancel the contract for environmental reasons, plaintiff would be entitled to recover out-of-pocket expenses. The release specifically excluded attorneys' fees from otherwise reimbursable out-of-pocket expenses.

On July 20, 1999, plaintiff submitted a claim to the contracting officer for recovery of out-of-pocket expenses associated with the *Friends of the Bow* litigation. This submission was made pursuant to provision CT6.01 of the contract, which provided:

CT6.01—*Interruption or Delay of Operations* (6/90)

Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:

1) To prevent serious environmental degradation or resource damage that may require contract modification under CT8.3 or termination pursuant to CT8.2;

2) To comply with a court order, issued by a court of competent jurisdiction; or

3) Upon determination of the appropriate Regional Forester, Forest Service, that conditions existing on this sale are the same as, or nearly the same as, conditions existing on sale(s) named in such an order as described in (b).

Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be (1) Contract Term Adjustment pursuant to BT8.21, or (2) when such an interpretation or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to BT8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber or any other anticipatory losses suffered by Purchaser.

On October 8, 1999, the contracting officer issued a decision on plaintiff's claim that allowed recovery of some costs associated with the delay in contract performance. Performance bond premiums, interest on the engineering services deposit, and interest on the down payment were deemed reimbursable out-of-pocket expenses. The contracting officer refused to reimburse plaintiff for attorneys' fees incurred in the *Friends of the Bow* litigation, on the ground that they were not out-of-pocket expenses within the meaning of provision CT6.01. Plaintiff now seeks recovery of these attorneys' fees in the amount of $30,032.00.

## DISCUSSION

### 1. *Summary judgment*

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c). Having cross-moved, each party bears the burden of demonstrating entitlement to judgment. *See Celotex Corp. v. Catrett,* 477 U.S.

317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The parties' cross-motions involve issues of contract interpretation, which are particularly well-suited for resolution by summary judgment. *See, e.g., Textron Defense Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir.1998).

### 2. *Interpreting the relevant contractual language*

Courts look to the language of the contract when resolving contract disputes. *Textron,* 143 F.3d at 1468. Where the contract "provisions are clear and unambiguous, they must be given their plain and ordinary meaning." *Alaska Lumber & Pulp Co. v. Madigan,* 2 F.3d 389, 392 (Fed.Cir.1993).

Provision CT6.01 of the contract gives rise to the question of whether "out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision" include attorneys' fees that plaintiff incurred during its intervention in the *Friends of the Bow* litigation. Plaintiff argues that its attorneys' fees were out-of-pocket expenses directly related to the interruption and delay of the Banner Timber Sale and that, consequently, they should be recoverable. Plaintiff advances several arguments in support of that conclusion.

#### 1) *The rule of ejusdem generis*

In the context of legal instruments, the *ejusdem generis* rule

> is that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest context, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.

*See Black's Law Dictionary* 517 (7th ed.1999); *Bristol–Myers Squibb Co. v. United States,* 48 Fed.Cl. 350, 358 (2000). The rule of *ejusdem generis* limits general terms which follow specific ones to matters similar to those specified. *See Emery Air Freight Corp. v. United States,* 205 Ct.Cl. 49, 499 F.2d 1255, 1261 (1974). Because its out-of-pocket expenses for attorneys' fees do not represent a loss related to the timber or

lumber and thus are not similar in kind or character to the list of cost categories excluded in CT6.01, plaintiff argues that its attorneys' fees are recoverable.

The rule of *ejusdem generis* is inapplicable to the language in question. In provision CT 6.01, the specific follows the general and not vice versa: "[O]ut-of-pocket expenses" is the general term, and "lost profits, replacement cost of timber or any other anticipatory losses" are the specific terms. A "reverse *ejusdem generis*" principle has been recognized, whereby the broader category could help define the scope of the specific example. *See Bristol–Myers*, 48 Fed.Cl. at 358. However, even if the general term "out-of-pocket expenses" were dependent on the specific terms "lost profits, replacement cost of timber or any other anticipatory losses," out-of-pocket expenses would be construed as applying to things of the same general kind of class as those specifically mentioned, *i.e.*, losses due to plaintiff's inability to harvest timber under the contract.

In an attempt to meld attorneys' fees into the category of "out-of-pocket expenses," plaintiff cites *Tapper & Associates v. United States*, 221 Ct.Cl. 27, 602 F.2d 311 (1979), for the proposition that the Forest Service's failure specifically to exclude attorneys' fees in CT 6.01 renders them included. *Tapper* involved a contract for the construction of a post office and vehicle maintenance facility that contained a provision requiring earth backfilling and other provisions which required gravel backfilling for the building, retaining walls, walks, roads, and other surfaced areas. Defendant contended that the contract was ambiguous with regard to the backfilling of utility trenches, arguing that the trenches should be backfilled with gravel. In ruling that earth backfill for utility trenches was permitted, the court held that, where several subjects are listed without including general words illustrating other subjects not named, subjects not named were meant to be excluded. Reasoning that because utility trenches were not included in the enumeration of items to be backfilled

with gravel and were not included under general words illustrating other subjects, the court ascertained an intention to exclude them.

Presumably, plaintiff is arguing in the case at bar that the several subjects excluded from out-of-pocket costs in CT 6.01—lost profits, replacement cost of timber or any other anticipatory losses—are not accompanied by general words illustrating that attorneys' fees would be excluded and, therefore, were not excluded. Plaintiff's theory can be interpreted in two ways.

On the one hand, because the Forest Service failed to exclude attorneys' fees either specifically or through the use of some general language such as "litigation costs," the *Tapper* rule applies, and attorneys' fees are included as out-of-pocket costs. On the other hand, as defendant has argued, the general terms "out-of-pocket expenses" and "anticipatory losses" impliedly exclude attorneys' fees, such that those words serve as the "general words illustrating other subjects" under *Tapper*. The first interpretation has greater merit. Because the Forest Service took steps specifically to exclude from out-of-pocket expenses certain items, it also could just have easily excluded attorneys' fees. From either party's standpoint, it is foreseeable that a lumber company would incur legal fees as a result of the Forest Service's suspension of a harvest for any reason. However, this result does not necessarily resolve the issue of whether the attorneys' fees sought in this case are recoverable.

### 2) *Whether the attorneys' fees were a direct result of the interruption*

Plaintiff has argued that its attorneys' fees, under CT6.01, were incurred as a "direct" result of the interruption caused by the *Friends of the Bow* litigation. Defendant responds that these fees were incurred by plaintiff's voluntary intervention in the *Friends of the Bow* litigation and thus were not the direct result of the delay caused by the injunction. Because the contract only contemplated the sale and removal of timber, defendant views direct damages[1] of the de-

---

1. Defendant uses the term "consequential" to describe these damages, which is a mistake.

Def.'s Br. filed Apr. 2, 2001, at 7.

lay as limited to expenses related to the tree harvest. Plaintiff rejoins that the mere fact that the expense was incurred voluntarily does not render an out-of-pocket expense unrecoverable. Plaintiff also argues that, given that it had a right to intervene and that the Government did not adequately represent its interests, plaintiff essentially had no choice but to intervene.

Direct means "[f]ree from extraneous influence; immediate." *See Black's Law Dictionary* 471. In order for plaintiff's legal fees to have been the direct result of the interruption, they would have to be the immediate result of the interruption. The interruption was brought about by an injunction ordered by the Colorado federal district court, an injunction that was requested by the Friends of the Bow and that directly impacted the Forest Service and its contract with plaintiff. Although the injunction had the effect of preventing the harvest of timber, despite the impact on the harvest, plaintiff's attorneys' fees were not the direct result of the litigation between the Friends of the Bow and the Forest Service under the definition of "direct." Plaintiff was not a party to that litigation until it intervened, and the injunction applied to the Forest Service, not plaintiff. Thus, plaintiff's attorneys' fees were not directly related to the litigation.

Plaintiff also takes the position that, because its intervention was critical to protecting its interests, the attorneys' fees were related directly to the litigation delay. However, whether plaintiff was required to intervene to protect its interests (and thereby incur attorneys' fees) is not the same proposition as whether its attorneys' fees were incurred as a direct result of the interruption. Whether plaintiff was required or forced to protect its interests is irrelevant, as the injunction operated on the Forest Service, and any direct damages had to flow from that injunction.

3) *Whether attorneys' fees are out-of-pocket expenses as defined by CT6.01*

Plaintiff takes the position that its attorneys' fees meet the definition of out-of-pocket expenses, pointing to the background of the Forest Service's efforts to limit its losses after increased litigation due to canceled contracts in the 1990s. Plaintiff also argues that because the Forest Service excluded attorneys' fees in later versions of provision CT6.01, the prior version of the release was tantamount to an intentional omission by the Forest Service.

Defendant rejects plaintiff's logic, citing *Mason v. United States,* 222 Ct.Cl. 436, 615 F.2d 1343 (1980), which held that "subsequent revision or clarification of contract language which has given rise to a disagreement is only wise, and does not constitute an admission." *Mason,* 615 F.2d at 1349. Plaintiff even concedes that a subsequent interpretation of a contract provision does not dictate how the prior provision should be interpreted. Thus, the Forest Service's revision of CT6.01 does not constitute an admission that the exclusion of attorneys' fees in the prior contract was purposeful.

Plaintiff cites *Reidhead Brothers Lumber Mill,* 00–2 BCA ¶ 31,144, 2000 WL 1474110, which involved provision CT6.01 and the issue of attorneys' fees. While instructive, this decision by the United States Department of Agriculture Board of Contract Appeals ("the AGBCA") is not binding on the court. *Textron,* 143 F.3d at 1468. The issue in *Reidhead* turned on whether attorneys' fees were incurred as a direct result of a delay, which is not the issue for which plaintiff cites the case as support—whether attorneys' fees are out-of-pocket expenses recoverable under CT6.01. More importantly, the AGBCA did not address whether attorneys' fees were recoverable: "[E]ntitlement to the claimed legal fees ... is not established as a contractual right or as precluded under the clause." *Reidhead,* 00–2 BCA at 153,815. Accordingly, the board held that "the purchaser may demonstrate that it incurred the legal fees as a direct result of the interruption or delay...." *Reidhead,* 00–2 BCA at 153,815. In its use of the term "may" (as well as "could arise" and "should entitlement be established") in the context of the attorneys' fees, the board relegated the contractor the burden of proving that "but for the suspension ..., the purchaser would not have had to request reimbursement of out-of-pocket expenses." *Id. Reidhead* thus is not helpful in

determining whether plaintiff's attorneys' fees were out-of-pocket expenses under CT6.01.

### 4) *Whether plaintiff's attorneys' fees constitute consequential damages*

■■■ Damages may only be recovered against the United States if they arise from the natural and probable consequences of a contract breach. *Bohac v. Department of Agriculture,* 239 F.3d 1334, 1340 (Fed.Cir. 2001). Remote or consequential damages cannot be recovered. *CCM Corp. v. United States,* 15 Cl.Ct. 670, 671 (1988). Damages resulting from a contract breach must have been contemplated by the parties when entering into a contract in order to be recoverable so that damages pleaded must have been foreseeable by the parties at the time of contracting. *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng. Rep. 145 (1854).

■■■ Plaintiff argues that CT6.01 contemplates court action as a reason for interruption, but does not go so far as to say that CT6.01 contemplates its intervention in a lawsuit brought against the agency. Defendant reads the provision to contemplate the sale and removal of timber only and that plaintiff's damages were limited to expenses related to the tree harvest. According to defendant, adopting plaintiff's position in effect would signal that the parties contemplated that the Forest Service would pay for an attorney to represent plaintiff in a lawsuit bought by an environmental group.

In order to analyze properly defendant's argument, it first must be assumed that the *Friends of the Bow* litigation constituted a breach of the contract by one of the parties. Second, it must be determined whether plaintiff's attorneys' fees were within the contemplation of the parties at the time of contracting. Plaintiff cannot demonstrate that its attorneys' fees were damages that were in

the contemplation of the parties at the time of contracting.

Plaintiff has argued that it is foreseeable that a contractor must incur attorneys' fees in order to protect its financial position in a delay-causing litigation. However, this argument misstates the issue. The issue is not whether it is foreseeable that plaintiff would become involved in such litigation (such involvement arguably being foreseeable), but whether attorney's fees incurred as the result of an environmental group, not a party to the instant contract, suing on the basis of environmental concerns were damages contemplated by the parties at the time of the contracting. Plaintiff has offered little to show that such damages were contemplated by the parties at the time of contracting. Furthermore, the enumerated excluded damages in CT6.01—lost profits, replacement cost of timber or any other anticipatory losses—reveal that timber-related expenses were in the contemplation of the parties, whether for exclusion or inclusion, and not unrelated litigation costs. This contract language further belies Plaintiff's argument that its attorney's fees were foreseeable.

### 5) *The effect given to the release*

The Forest Service argues that provisions of the September 1998 release resolve the issue as to whether attorneys' fees related to the delays are recoverable, to wit, the language of the release supersedes any other liability provisions in the contract:

> Purchaser, Bighorn Lumber Company, Inc., hereby releases the Government from any and all liability arising from the suspension, modification, or cancellation (in whole or in part) of contract no. 02–003055 in order to protect sensitive, threatened, or endangered species, or for other environmental reasons.

Plaintiff attempts to avoid this broad language with several arguments.[2]

---

**2.** The "Release from Liability Statement" reads, in pertinent part:

Purchaser, [plaintiff], hereby releases the Government from any and all liability arising from the suspension, modification, or cancellation (in whole or in part) of contract no. 02–003055 in order to protect sensitive, threatened, or endan-

gered species, or for other environmental reasons.

In the event the United States is compelled to suspend, modify, or cancel (in whole or in part) contract no. 02–003055 for environmental reasons, Purchaser, [plaintiff], and United States agree that the compensation to the Purchaser shall be limited to the following:

Even if the release applied retroactively, plaintiff argues, it was never triggered because the *Friends of the Bow* litigation was not a suspension for "environmental reasons." However, the true nature of the complaint, as stated by defendant, is that it was the *Friends of the Bow* defendants' "failure to comply with the APA, NEPA and NFMA [that] have injured the past and future interests of members of Friends in studying the forest and in protecting its wildlife, essential ecological functions, clean water and natural scenery." (Emphasis added.) Def.'s Proposed Finding of Uncontroverted Facts No. 6, filed Apr. 2, 2001. It is apparent that the basis of the Friends of the Bow's legal action was to redress environmental concerns and was not centered around APA violations: "Defendant's failure to respond meaningfully and specifically to plaintiffs' appeal was in violation of applicable law: by failing to ensure a sustainable yield of timber, by failing to ensure protection of remaining trees by blow-down, by reducing vegetation diversity ... by failing to consider chronic impacts to watersheds and fisheries ...." *Id.* No. 15.

Plaintiff also argues that the plain language of the release indicates prospective application. Defendant, however, reads the language of the "above terms supersede any other compensation and/or liability provisions in this contract" to exclude attorneys' fees from out-of-pocket expenses. Despite defendant's assertion, the face of the release admits only of prospective application from September 22, 1998. The release became operative only when "the United States is compelled to suspend, modify, or cancel ... for environmental reasons." Moreover, the release uses the phrase "[i]n the event of" four times, which indicates that compensation is to be paid only upon the future occurrence of the specified contingencies.

Finally, plaintiff unnecessarily argues that, because the contracting officer did not rely

on the release, it was not applicable to plaintiff's claim for attorneys' fees. Plaintiff cites *Mecon Co.*, 69–2 BCA ¶ 7,786, 1969 WL 681, which involved a release signed by a contractor subsequent to filing a claim for the cost of purchasing and installing plywood. The board ruled that execution of what appears to be release is not effective to bar a claim where the parties' conduct indicates that they have not interpreted the release as an abandonment of the claim.

*Mecon* is factually distinguishable from the instant case. Unlike the instant case, the release at issue in *Mecon* was signed after the claim arose. In *Mecon* an exchange of letters and discussions occurred over a six-month period following the execution of the release before plaintiff's claim was finally denied. Here, plaintiff offers no conduct on the part of the Forest Service following the execution of the release, with the exception of the contracting officer's decision, that would indicate that the Forest Service did not interpret the release as abandoning plaintiff's claim. Thus, *Mecon* is not instructive.

Plaintiff also cites *Winn–Senter Construction Co. v. United States*, 110 Ct.Cl. 34, 75 F.Supp. 255 (1948), where a contracting officer's decision was deemed relevant to the decision whether a release barred the claim. As pointed out by defendant, however, the court is not bound by either the findings of fact or conclusions of the contracting officer. *See Wilner v. United States*, 24 F.3d 1397, 1401 (Fed.Cir.1994) (en banc). Again, plaintiff cites a case which offers no guidance.

### 3. Sovereign immunity

▮ Founded on the principle that "the King can do no wrong," sovereign immunity is a judicial doctrine that precludes suits against the Government without its consent. "[U]nder the doctrine of sovereign immunity,

---

1. In the event of suspension, a contract term adjustment and out-of-pocket expenses in accordance with the contract.

2. In the event of a modification, a rate redetermination and out-of-pocket expenses in accordance with the contract.

3. In the event of a cancellation (in whole or in part), out-of-pocket expenses: value of unused Purchaser Credit; and estimated ex-

penditures for felling, bucking, lopping, skidding, and decking any products so processed, but not removed from Sale Area because of termination action. Compensation does **NOT** include the cost of replacement timber.

Out of pocket expenses do not include attorney's fees, lost profits, replacement timber, or any other anticipatory losses by Purchaser. (Emphasis in original.)

the United States cannot be held liable for costs without its consent." *See Johns–Manville Corp. v. United States,* 893 F.2d 324, 326 (Fed.Cir.1989). Where the United States has given its consent, the terms of its consent define the court's jurisdiction to entertain the suit. *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). Any waiver of sovereign immunity, and hence consent to be sued, must be expressed unequivocally and cannot be implied. *United States v. Nordic Village, Inc.,* 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Cosmic Constr. Co. v. United States,* 697 F.2d 1389, 1390 (Fed.Cir.1982). Moreover, a waiver must be unequivocally expressed in a statute and will not be implied. *Bohac,* 239 F.3d at 1339.

Defendant argues that the United States has not waived sovereign immunity with regard to attorneys' fees. Plaintiff insists that the Contract Disputes Act, 41 U.S.C.A. §§ 601–613 (1994 & Supp. V 1999), waives sovereign immunity for such a claim, but cites no legal authority to support that position. Application of the sovereign acts defense involves a two-step test where the court must ask whether the action that impedes the Government's performance of the contract is in fact a sovereign act and, then, whether the Government has shown that the sovereign act rendering its performance impossible was an event contrary to the basic assumption of the parties. *Scott Timber v. United States,* 40 Fed.Cl. 492, 507–08 (1998), *vacated on other grounds* 44 Fed.Cl. 170 (1999).

Plaintiff posits that the sovereign acts doctrine does not limit the recovery of a timber purchaser's damages under C6.01, the sister provision to CT6.01 and cites *Scott Timber,* 40 Fed.Cl. 492. *Scott Timber* involved the "sovereign acts" defense, where the Government unsuccessfully argued that numerous actions taken by the Forest Service to protect the murrelet, a species of bird, and a district court's temporary restraining order, were sovereign acts that prevented it from being held liable for breaching its contracts with Scott Timber. It bears noting that plaintiff fails to address the first prong of the

test, but, in any event, plaintiff's rote comparison of the court's analysis of C6.01 in *Scott Timber* is inapposite to the present case. In *Scott Timber* the Government could not establish that the non-occurrence of the listing of the murrelet was a basic assumption of the contract. To "the contrary, clauses C6.01 and C6.25 of the contracts ... show that the parties specifically foresaw the possibility that additional species might be added ... that additional species might be located on the sales areas, or that performance ... might threaten the existence of protected species." *Scott Timber,* 40 Fed.Cl. at 508. The court concluded that, because the relevant clauses specified the rights and responsibilities of the parties in the event any of the stated contingencies arose, the terms of the contract would control.

Plaintiff has misapplied the sovereign acts doctrine in several respects. The sovereign acts doctrine, or defense, typically is invoked by the United States to shield itself "from liability for *breach* of contract when the United States, by virtue of a *'sovereign act,'* impairs the performance of a contract to which the United States is a party." (Emphasis added.) *Scott Timber,* 40 Fed.Cl. at 507. What distinguishes *Scott Timber* from the instant case is that the Forest Service did not breach its contract with plaintiff. *Scott Timber* analyzed C6.01 in reference to the Government's authority to suspend plaintiff's contracts, not the recoverability of attorneys' fees under that provision. Finally, plaintiff here fails to ascribe any particular "act" to the Forest Service as being sovereign.

With respect to the second prong, plaintiff has not alleged, nor can it maintain, that the non-occurrence of the *Friends of the Bow* litigation and associated attorneys' fees were basic assumptions of the contract by either party.

Plaintiff also relies on *Concept Automation, Inc. v. United States,* 41 Fed.Cl. 361 (1998), involving, *inter alia,* the issue of whether bid protest costs, including attorneys' fees, were recoverable.[3] The decision

---

**3.** The issue of sovereign immunity was limited to

the court's discussion of defendant's motion to

discusses whether an award of attorneys' fees is a departure from the American Rule, by which each party bears its own litigation costs, under the bid protest scheme established by federal law. *Concept Automation,* 41 Fed.Cl. at 366. Although the court ultimately awarded plaintiff's bid protest costs, it did not specifically address the immunity argument. Consequently, *Concept Automation* is not probative of the sovereign immunity issue because the court's decision focused on the issue of whether attorneys' fees, as a subset of bid preparation costs, were foreseeable damages arising from a breach of the Government's implied contract to treat bids honestly and fairly.

### 4. *Recovery of attorneys' fees absent specific authorization*

Raising an issue closely-related to sovereign immunity, defendant argues that attorneys' fees and other litigation expenses encountered with a breach of contract are not recoverable without specific authorization, citing *Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264 (1981). *Kania* involved an alleged breach of contract where the United States Attorney's Office agreed not to prosecute plaintiff in return for his truthful testimony before a grand jury about political and financial corruption regarding the Railway Express Agency, Inc., for which he served as vice president of finance. Subsequent to plaintiff's testimony, a grand jury indicted him. The indictment was dismissed, and plaintiff sought to recover attorneys' fees expended defending himself. The court held that plaintiff was not entitled to attorneys' fees because "absent specific legislation to the contrary, the costs of litigation, including attorneys' fees, are not recoverable in federal litigation ." *Kania,* 227 Ct.Cl. at 466.

 Plaintiff attempts to distinguish *Kania* because it involved an attempt to secure attorneys' fees based on a breach of contract theory. However, the general principle that litigation costs, including attorneys' fees, are not recoverable without specific authorization is applicable whether plaintiff's attorneys'

dismiss, which was denied because the court concluded that plaintiff should have an opportu-

fees were characterized as litigation costs or contract damages. *Id.* at 467.

### CONCLUSION

Accordingly, based on the foregoing, defendant's cross-motion for summary judgment is granted and plaintiff's motion for summary judgment is denied. The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**

No costs.

nity to demonstrate whether the Government's conduct was arbitrary and capricious.