CROSS PETROLEUM, Plaintiff,

v.

The **UNITED STATES,** Defendant.

No. 97–251C.

United States Court of Federal Claims.

Jan. 25, 2002.

might proceed without his participation.

Walter P. McNeill, Redding CA, for plaintiff.

Michael F. Kiely, Washington, DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. Rose Miksovsky and James Andrews, U.S. Department of Agriculture, San Francisco, CA, of counsel.

## ORDER

MILLER, Judge.

This case is before the court after argument on cross-motions for summary judgment. The issue to be decided is whether the parties' several contracts allocated the risk of a fuel spill. The tension arises from the fact that, on the date of the spill, plaintiff made a separate delivery of fuel under a contract that included an indemnity provision and that potentially reaches the fuel spilled.

## FACTS

The following facts are undisputed.[1] The United States Department of Agriculture Forest Service (the "Forest Service") manages the Klamath National Forest ("KNF"), which spans approximately 2,656 square miles in Siskiyou County, California, and Jackson County, Oregon. Several sites throughout KNF serve as year-round support centers for Forest Service activities. One of these sites is the Oak Knoll Work Center ("Oak Knoll"), located approximately 20 miles northwest of Yreka, California.

For over 12 years, Cross Petroleum ("plaintiff") has supplied gasoline and diesel fuel to Forest Service facilities in KNF, including Oak Knoll. On April 30, 1993, plaintiff delivered 960 gallons of diesel fuel to Oak

---

1. Plaintiff filed Plaintiff's Proposed Findings of Fact on August 31, 2001. Because Defendant's Proposed Findings of Fact, filed on October 23, 2001, took no exception to Plaintiff's Proposed Findings of Fact, plaintiff's proposed findings are undisputed.

Knoll. On the same trip, plaintiff also attempted to deliver 2,000 gallons of unleaded gasoline to an underground storage tank at Oak Knoll, but instead deposited the gasoline into a nearby monitoring well. The monitoring well, designed to detect leaks from the underground tank, is extensively perforated, and the gasoline therefore passed through the well and into the subsurface. On April 8, 1996, the Forest Service contracting officer issued a final decision asserting a claim against plaintiff in the amount of $705,657.82 for costs associated with the spill. Plaintiff responded by filing a complaint in the Court of Federal Claims challenging the final decision, specifically the contractual basis for the Government's claim. Each party has cross-moved for summary judgment on whether liability for the April 30 spill and subsequent clean up allocated to plaintiff by a contract with the Government.[2]

The Forest Service awards two types of contracts for the delivery of fuel in KNF based on the estimated annual gallonage of the tank location served. Tank locations with an estimated annual gallonage of over 10,000 gallons are supplied through biannual contracts solicited by the Defense Logistics Agency (the "DLA") and subject to national competitive bidding, while tank locations with an estimated annual gallonage of 10,000 gallons or less are supplied through annual contracts solicited by the Forest Service. *See* 41 C.F.R. § 101–26.602 (1993). Plaintiff has supplied fuel to KNF under both types of contract.

1. *Diesel fuel delivery*

At the time of the spill, the Forest Service had a local fuel contract with plaintiff, contract no. 54–91W8–3–3005 (the "1993 local contract"). The 1993 local contract expressly provided for the delivery of diesel fuel to a 1,000 gallon tank at Oak Knoll, but did not provide for the delivery of unleaded gasoline because Oak Knoll's unleaded tank had an estimated annual gallonage of roughly 29,100 gallons. Per the regulatory scheme described above, each of the tank locations in

the 1993 local contract, including Oak Knoll's diesel tank, had an estimated annual gallonage of less than 10,000 gallons.

Section C–2.1 of the 1993 local contract, entitled "Protection of Government Property and Spill Prevention," provides:

The Contractor shall use reasonable care to avoid damaging or contaminating existing buildings, equipment, asphalt pavement, soil or vegetation (such as trees, shrubs, and grass) on the Government installation. If the Contractor fails to use reasonable care and damages or contaminates any such buildings, equipment, asphalt pavement, soil or vegetation, or other Government facilities, the Contractor shall replace the damaged items or repair the damage at no expense to the Government, and to the satisfaction of the Government. Further, if as a result of failure of the Contractor to comply with the requirements of this contract, Government buildings, equipment, asphalt pavement, soil or vegetation or other Government facilities become damaged or destroyed, the Contractor shall replace or repair the damage at no expense to the Government, and to the satisfaction of the Government. Should the Contractor fail or refuse to make such repairs or replacements, the Government may have the repairs or replacement accomplished, and the Contractor shall be liable for the cost thereof .... In the event the Contractor spills any oil (including, but not limited to, gasoline, diesel fuel, fuel oil, or jet fuel), the Contractor shall be responsible for the containment, clean up, and disposal of the oil spilled. Should the Contractor fail or refuse to take the appropriate containment, clean up and disposal actions, the Government may do so itself. The Contractor shall reimburse the Government for all expenses incurred including fines levied by federal, state or local governments.

This provision is the same as, or substantially similar to, a provision contained in prior local contracts between the Forest Service and plaintiff for the purchase and delivery of fuel

---

2. The comparative negligence of the parties is the subject of litigation before the United States District Court for the Eastern District of California, currently stayed pending resolution of this case. *United States v. Cross Petroleum, Inc.*, CIV S–99–0664 LKK GGH. (E.D.Cal.).

to KNF. Price under the 1993 local contract was based on the weekly Oil Price Index Service figure. The 1993 local contract also provided that invoices would not be paid unless itemized with unit prices, taxes, and contract number.

It is undisputed that the April 30 delivery of unleaded gasoline to Oak Knoll was not made under the 1993 local contract. It is also undisputed that plaintiff successfully delivered 960 gallons of diesel fuel to Oak Knoll on April 30 pursuant to the 1993 local contract. Consequently, defendant argues that the indemnity provision of the 1993 local contract allocates liability for the April 30 spill, even though the fuel spilled was unleaded gasoline, and even though the spill occurred after completion of the diesel delivery and during the attempted delivery of unleaded gasoline.

### 2. Unleaded fuel delivery

The contractual basis for the delivery of unleaded gasoline to Oak Knoll on April 30, 1993, is not documented in the record. Historically, Oak Knoll has received its unleaded fuel supply through a DLA contract, because the estimated annual gallonage of the unleaded tank at that location exceeds 10,000 gallons. For the term commencing on November 1, 1990, and running through October 31, 1992, plaintiff supplied unleaded gasoline to Oak Knoll under a DLA contract. The Forest Service did not submit Oak Knoll's unleaded fuel requirements in time for Oak Knoll to be included in the DLA's solicitation for the next fuel supply contract, No. DLA 600–93–D–4508 (the "1992–94 DLA contract"),[3] commencing on November 1, 1992, and running through October 31, 1994, which also was awarded to plaintiff.[4]

Section I–186 of the 1992–94 DLA contract, entitled "Protection of Government Property and Spill Prevention," is identical to Section C–2.1 of the 1993 local contract and is the same as, or substantially similar to, a provision contained in other DLA contracts

for the purchase and delivery of fuel to KNF. The 1992–94 DLA contract based price on the "CPC" reference index.

Neither the 1992–94 DLA contract nor the 1993 local contract was modified formally to provide for the delivery of unleaded gasoline to Oak Knoll. On October 21, 1992, a meeting was held between Forest Service employee Sheri Akkerman, plaintiff's employee Margean Briggs, and Forest Service Contracting Officer's Representative Ruby Metcalf to discuss fuel delivery to the tank locations that had been left off of the 1992–94 DLA contract. According to plaintiff, the parties agreed to a series of "open market" purchases of fuel, with the price based on the CPC reference index. Plaintiff suggests that these open market purchases were made pursuant to a specific "blanket agreement," on an *ad hoc* basis, or pursuant to the Forest Service's general authority to make small purchases of miscellaneous supplies. *See* Pl.'s Proposed Findings Nos. 14, 15, filed Aug. 31, 2001.

Plaintiff continued making unleaded fuel deliveries to Oak Knoll in 1993: on or about March 11 (1,500 gal.), May 5 (824 gal.), July 6 (967 gal.), August 25 (921 gal.), September 9 (500 gal.), and September 24 (363 gal.). These deliveries were made at the request of the Forest Service and without objection by plaintiff. It was during an attempt to deliver 2,000 gallons of unleaded fuel to Oak Knoll on April 30 that the spill occurred. Plaintiff's billing invoices to the Forest Service for deliveries of unleaded gasoline to Oak Knoll used the CPC reference index price. Moreover, plaintiff did not place a contract number on the billing invoices. The Forest Service did not object to the use of the CPC reference index or the absence of contract numbers on the billing invoices.

### DISCUSSION

Summary judgment is appropriate only when the moving party is entitled to judgment as a matter of law and there are no

---

3. The 1992–94 DLA contract originally was solicited as No. DLA600–92–B–0007.

4. The regulations in effect at the time required the Forest Service to submit to DLA estimates of annual fuel requirements for any delivery point

that would receive in excess of 10,000 gallons. 41 C.F.R. § 101–26.602–3. Oak Knoll was included on the DLA contract for 1994 through 1996, which was also awarded to plaintiff.

disputes over material facts that may significantly affect the outcome of the suit. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Having cross-moved, each party bears the burden of demonstrating entitlement to judgment, as well as the absence of issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Defendant moves for summary judgment on two theories as to how liability was assigned by contract to plaintiff for the April 30 spill and subsequent clean up. Defendant argues that an implied-in-fact contract existed between the parties for the delivery of fuel to Oak Knoll and that this contract contained a pollution indemnity provision substantially the same as the one contained in the 1993 local contract and the 1992–94 DLA contract. Defendant also argues that the 1993 local contract governs the facts of this case—specifically, that contract's pollution indemnity provision. Plaintiff contends that it is entitled to judgment as a matter of law on both theories advanced by defendant.

### 1. *Implied-in-fact contract*

■ Defendant views the parties' agreement to deliver unleaded fuel to Oak Knoll on April 30, 1993, as governed by an implied-in-fact contract containing a pollution indemnity provision that is identical—or at least similar—to that contained in the parties' local and DLA contracts. "The general requirements for a binding contract with the United States are identical for both express and implied contracts." *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir. 1997). To establish a contract with the Government, a party must show (1) mutuality of intent to contract; (2) consideration; (3) lack of ambiguity in offer and acceptance; and (4) actual authority of the Government representative whose conduct is relied upon to bind

the Government in contract. *Lewis v. United States*, 70 F.3d 597, 600 (Fed.Cir.1995).

■ Plaintiff argues that defendant has failed to establish these elements.[5] The parties' briefs do acknowledge that the Forest Service requested fuel from plaintiff and that plaintiff responded by delivering fuel to the Forest Service. This "arrangement" or "transaction," as plaintiff refers to it, Pl.'s Br. filed Aug. 31, 2001, at 9; Pl.'s Br. filed Dec. 3, 2001, at 6, appears to be an express, unilateral contract—the Forest Service manifested its intent to be bound by its request, and plaintiff by its performance. The existence of such an express agreement would seriously undermine defendant's suggestion that the April 30, 1993 delivery was the subject of an implied-in-fact contract. *Trauma Serv.*, 104 F.3d at 1326; *Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed.Cir. 1990); *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 673, 428 F.2d 1241, 1255 (1970). A difference exists, however, between implying a contract where an express agreement already exists on the same subject, and determining the content or meaning of an unwritten express contract by reference to custom. Course of dealing, course of performance, and usages of trade are all relevant to determining the content and meaning of an express contract, particularly where the contract is not reduced to writing.

In this case the facts concerning the nature of the parties' agreement are woefully underdeveloped. Plaintiff's proposed findings of fact 14 and 15 reflect its own uncertainty as to whether the delivery of fuel to Oak Knoll was made under a "blanket agreement" (that may or may not have incorporated an earlier contract by reference), an informal "open market" purchase, or the Forest Service's "general authority for small purchases of miscellaneous supplies." Pl.'s Proposed Finding of Fact Nos. 14, 15, filed Aug. 31, 2001.

---

**5.** While acknowledging the transactional nature of the parties' relationship, plaintiff resists the conclusion that a contract existed between them. Plaintiff argues that, since Contracting Officer Lola Capp believed that the unleaded fuel deliveries were made under the 1993 local contract, no "meeting of the minds" can be found. Pl.'s

Br. filed Dec. 3, 2001, at 7–8. Plaintiff also argues that the relevant Forest Service personnel lacked authority to bind the Government and that any agreement to supply a fuel tank with an estimated annual gallonage in excess of 10,000 gallons would be invalid unless solicited by the DLA and subject to national competitive bidding.

The parties' apparent acknowledgment that fuel was delivered for consideration, coupled with their failure to identify the source of this agreement, leads the court to conclude that neither party has met its initial burden of showing the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The parties' cross-motions for summary judgment are therefore denied as to the existence or nonexistence of an implied-in-fact contract governing the April 30, 1993 delivery of unleaded gasoline to Oak Knoll.

2. *The 1993 local contract*

Defendant concedes that neither the 1993 local contract nor the 1992–94 DLA contract provided for the delivery of unleaded gasoline to Oak Knoll in April 1993. Instead, defendant argues that, because plaintiff was delivering diesel fuel on April 30 pursuant to the 1993 local contract, that contract's pollution indemnity provision covers the spill of unleaded gasoline, even though the fuel spilled was not diesel and even though the spill occurred after completion of the diesel delivery and during the attempted delivery of unleaded gasoline.

■■■ Contract interpretation is a question of law and is therefore particularly amenable to resolution on summary judgment. *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed.Cir.1996); *Gov't Sys. Advisors, Inc. v. United States,* 847 F.2d 811, 812 n. 1 (Fed.Cir.1988). General rules of contract interpretation apply to contracts to which the Government is a party. *Lockheed Martin IR Imaging Sys., Inc. v. West,* 108 F.3d 319, 322 (Fed.Cir.1997). The provisions of a contract must be read as part of an organic whole, according reasonable meaning to all of the contract terms, and assuring that no contract provision is made inconsistent, superfluous, or redundant. *Id.*

■■■ The court's examination begins with the plain language used by the parties in contracting. *Textron Defense Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir.1998); *Aleman Food Servs., Inc. v. United States,* 994 F.2d 819, 822 (Fed.Cir.1993). The words of a contract are deemed to have their ordinary meaning appropriate to the subject matter, unless a special or unusual meaning of a particular term or usage was intended, and was so understood by the parties. *Lockheed Martin,* 108 F.3d at 322. When the contract language is unambiguous, the court's inquiry is at an end and the plain language of the contract is controlling. *Textron Defense,* 143 F.3d at 1469. A contract term is unambiguous when there is only one reasonable interpretation. *Triax Pac., Inc. v. West,* 130 F.3d 1469, 1473–74 (Fed.Cir. 1997); *A–Transport N.W. Co. v. United States,* 36 F.3d 1576, 1584 (Fed.Cir.1994).[6]

■■ Plaintiff contends that the clear import of the 1993 local contract does not encompass the April 30, 1993 spill. In its reply and response, plaintiff argued that applying the indemnity provision of the 1993 local contract to the spill "defies the plain meaning and language" of that contract.

That contract provides for deliveries of specific types of petroleum products to specific tanks located in different places throughout [KNF]. Tanks which are listed in the Schedule for the contract are covered by the contract, and conversely tanks which are not listed are outside the contract.... The fact that [plaintiff's] driver went to the unleaded tank and later made a delivery to the diesel fuel tank on the same day and in the same trip does nothing to erase the distinction between tanks covered by the contract and tanks outside the contract. Furthermore, the govern-

---

6. If a contract provision is susceptible to more than one reasonable interpretation, each of which is consistent with the contract language and with the other provisions of the contract, the contract is ambiguous. *Com'y Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir. 1993). Declining to argue that either the indemnity provision, or the 1993 local contract as a whole, is ambiguous, each party insists on its own interpretation as the only reasonable appli-

cation of the 1993 contract to the facts of this case. The court has considered the possibility that ambiguity exists—a suspect inquiry in the absence of briefing on the subject—but concludes that the single interpretation advanced by plaintiff is unreasonable. Consequently, issues of latent or patent ambiguities and their impact on contract interpretation are not present. *See Lockheed Martin,* 108 F.3d at 322.

ment offers no facts to support the concept that the pollution incident involving the unleaded tank was an act in furtherance of performance of diesel fuel under the contract.

Pl.'s Br. filed Dec. 3, 2001, at 5. According to plaintiff, the plain meaning of the 1993 local contract applies the pollution indemnity provision only if the spill occurs while plaintiff was (1) delivering fuel listed in the schedule of the 1993 local contract or (2) engaged in an act in furtherance of the delivery of fuel listed in the contract.

Plaintiff's briefs offered no further explanation as to why the indemnity provision can be so limited when its express terms cover spillage of fuel other than the fuel listed in the schedule. The indemnity provision broadly provides: "In the event the Contractor spills any oil (including, but not limited to, gasoline, diesel fuel, fuel oil, or jet fuel), the Contractor shall be responsible for the containment, clean up, and disposal of the oil spilled." The provision applies to any oil spilled; no language in the contract confines "*any oil*" to the fuel to be delivered under the schedule. Indeed, the indemnity provision broadly includes "gasoline, diesel fuel, fuel oil, or jet fuel," even though Section C–1, "Scope of the Contract," and Section B, "Supplies or Services and Price/Costs," are limited to "diesel or gasoline." The plain meaning of the indemnity provision covers spillages even if the fuel spilled was not required to be delivered under the schedule. Plaintiff offered no evidence, such as trade or industry usage, to support a special or unusual meaning.

The entire indemnity provision is cast in prophylactic terms, requiring plaintiff to "use reasonable care to avoid damaging or contaminating existing buildings, equipment, asphalt pavement, soil or vegetation (such as trees, shrubs, and grass) on the Government installation." Not addressing the provision's obvious coverage of damage in addition to fuel spills, plaintiff proceeds from the untenable proposition that the "any fuel" covered by the indemnity provision is limited to the type of fuel specified for delivery. Yet the contract itself demonstrates that when the parties wanted to discuss the fuel to be delivered

under the schedule, they did so by express reference. For example, the following provision in the contract provides: "The automotive gasoline referenced in this solicitation shall be furnished in accordance with [American Society for Testing and Materials specifications]."

Arguing that the spill must occur while plaintiff is engaged in an act in furtherance of the delivery of fuel listed in the contract, plaintiff suggested at oral argument that this limitation is implied from the position of the indemnity provision within the contract. Apparently, plaintiff's argument is that, as the indemnity provision is contained in Section C, "Description/Specifications/Work Statement"—and more specifically Section C–2, "Technical Specifications"—it operates as a limitation only on work called for under the contract and cannot apply to activities beyond the scope of the contract. The fact that this provision comes under the heading "Technical Specification" does not invite the court to ignore the plain meaning of the provision's language. The indemnity provision does not just qualify the contractor's performance. That qualification is established by Section F–8: "All work under this contract shall be performed in a skillful and workmanlike manner." The indemnity provision places on the contractor a duty separate and beyond the delivery of fuel.

This construction of the indemnity provision does not upset the framework of the contract. Section C–2, "Technical Specifications," contains two provisions: C–2.1, the indemnity provision, and C–2.2, "Gasoline Requirements," which provides technical specifications for gasoline and diesel fuel delivered under the contract. Section H, "Special Contract Requirements," and Section F, "Deliveries or Performance," each contain terms that, like Section C–2.2, describe or define performance, as well as terms that, like Section C–2.1, allocate risk and establish the rights of parties beyond the delivery of fuel. For example, section F–8 provides that "[a]ll work under this contract shall be performed in a skillful and workmanlike manner," but goes on to provide that "[t]he Contracting Officer may require, in writing, that the Contractor remove from the work any

employee the Contracting Officer deems incompetent, careless, or otherwise objectionable." Similarly, Section H, "Special Contract Requirements," reserves the Government's right to terminate the contract if necessary to avoid an organizational conflict of interest. The contract contains no overarching structure the prevents a straightforward interpretation of the broad language of the indemnity provision.

Plaintiff argues that "[i]t would be weird and inexplicable if Cross Petroleum could be held liable for anything that might occur during a single trip, no matter what the activity, as long as a delivery to the diesel fuel tank is made at some time during that trip." Pl.'s Br. filed Dec. 3, 2001, at 6. This case does not call for a decision as to whether the indemnity provision applies "no matter what the activity." The court holds that, under the contract, plaintiff agreed to indemnify the Government for any spillage of fuel that occurs when plaintiff enters KNF to deliver fuel under the contract.

The Government saw the potential danger in purchasing fuel for delivery in a national forest and obtained, with plaintiff's consent, a safeguard against possible spills. Moreover, the Government was acutely aware of the increased danger that would result if, in making the deliveries listed in the schedule, plaintiff was also carrying fuel for deliveries not on the schedule. Section F–8 thus instructs: "Delivery may be made when making other deliveries in the area only upon approval of the designated District or Service Center Representative." Consequently, the indemnity provision covers "any fuel," not just fuel listed in the schedule, and to make sure there was no confusion, the indemnity provision included "gasoline, diesel fuel, fuel oil, or jet fuel," even though the contract only called for deliveries of gasoline and diesel fuel. To the end of avoiding any confusion, the contract imposed a broad duty of care on plaintiff to avoid any damage or contamination to KNF.

Plaintiff proceeds on the flawed premise that, when it ceased delivering diesel fuel, the 1993 local contract was switched "off," and when it began delivering "unleaded" fuel, another agreement was switched "on." Because the spill occurred while plaintiff was delivering unleaded fuel, plaintiff further argues that the court should apply the informal agreement governing that delivery, which it argues did not contain an indemnity provision. The court accepts that the delivery of unleaded fuel was neither required by the 1993 local contract nor in furtherance of it, and the court assumes, *arguendo*, that the contract for unleaded fuel did not contain an indemnity term. The court differs with plaintiff over whether the 1993 local contract was, by its own terms, switched "off."

The contract anticipated the inherent danger of bringing commercial fuel trucks onto KNF. It is therefore neither "weird" nor "inexplicable" that this provision should apply as long as plaintiff was in KNF in connection with the contract, and that the provision would continue to apply even though the parties made subsequent arrangements for additional deliveries in KNF. Although it did not do so, plaintiff might have argued that, in hindsight, it would not have agreed to a term that would be operative regardless of whether a given fuel was the subject of a separate contract. Of course, defendant would have rejoined that such coverage, and plaintiff's agreement to it, neither is unreasonable nor alters the plain meaning of the contract. It is entirely reasonable that the Government would demand the widest margin of indemnification possible and that this coverage might overlap with other activities of plaintiff. This is the plain meaning of the contract, and plaintiff agreed to it.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Defendant's cross-motion for summary judgment is granted, and plaintiff's motion for summary judgment is denied, insofar as the indemnity provision of the 1993 local contract encompasses the April 30, 1993 spill.

2. The parties' cross-motions for summary judgment are denied as to the existence or nonexistence of an implied-in-fact contract governing the April 30, 1993 delivery of unleaded gasoline to Oak Knoll.

3. A scheduling order has been entered separately.

4. The court's chambers this date transmitted a copy of this order to counsel by facsimile transmission.